[No. D045854. Fourth Dist., Div. One. Apr. 29, 2005.]

DEBORAH M., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
DARYL W., Real Party in Interest.

**COUNSEL**

Dennis O. Seymour, Jr., for Petitioner.

No appearance for Respondent.

Law Offices of Matthew M. Kremer, Matthew M. Kremer and Damon B. Forney for Real Party in Interest.

**OPINION**

**NARES, J.**—In this petition we are asked to determine if Family Code[1] section 3041.5, subdivision (a) (section 3041.5(a)) permits courts in custody and visitation proceedings to order drug testing by means of a hair follicle test of a parent whom the court has determined engaged in "habitual, frequent, or continual illegal use of controlled substances." We conclude the language of section 3041.5(a), relevant federal regulations, and section 3041.5(a)'s statutory history demonstrate that at present only urine tests are allowed. Accordingly, we grant the petition and order the court to vacate its order compelling the hair follicle drug test.

### FACTUAL AND PROCEDURAL BACKGROUND

Petitioner Deborah M. and real party in interest Daryl W. were divorced in 1995, and Deborah[2] was awarded primary custody of their two sons, C.W., who was 14 years old at the time of the instant proceedings, and W.W., who was 18 years old at the time.

In September 2004, Deborah sought to have her child support amended. In response, Daryl filed an order to show cause (OSC) seeking a change in custody and visitation, as well as an order for drug testing. In support of the OSC, Daryl submitted a declaration from their son W.W. indicating that he believed that his mother used drugs. Specifically, W.W. stated that his belief was based upon "several incidences [*sic*] that have occurred over the past year. [One] incident which I have first hand knowledge of, occurred about a week before Christmas 2002, in the evening. I arrived home at about 5:00 p.m. to find my brother, [C.W.], home alone. [C.W.] told me he had found Mom's 'stash.' I told him I did not believe him so he showed me a small piece of paper folded up to form a pouch. I looked inside the pouch and saw a quarter size amount of white, clumpy, powdery substance." When Deborah was confronted about the "stash," she claimed that "it wasn't hers, it was for a friend." W.W. in his declaration requests that the court order Deborah to "take a hair follicle drug test because I am concerned that she may be using drugs and exposing and allowing [C.W.] access to drugs."

In support of the OSC, Daryl also submitted a mediation report from Beverly J. Pruitt, a counselor for the superior court's family court services. In the report she related a mediation session which Deborah and Daryl attended. In the report, Pruitt wrote of Daryl's contention that he was seeking primary custody of C.W. because Deborah was using illegal drugs. This allegation

---

[1] All further statutory references are to the Family Code.

[2] References to the parties by their first names are for purposes of clarity only. We intend no disrespect.

was based on the facts stated in W.W.'s declaration. Daryl claimed that Deborah had a history of using drugs and that C.W. "keeps finding drugs in the house."

In response, Deborah told Pruitt that she last used drugs in September 2002 and that she was opposed to any drug testing. Deborah also related that Daryl had not made consistent contact with C.W. and that Daryl had recently been arrested for being drunk in public. She admitted that C.W. found cocaine in her dresser drawer, but claimed that it belonged to a friend. Pruitt also interviewed C.W. before preparing her report.

Pruitt recommended that the parents retain joint legal custody, but that primary physical custody be awarded to Daryl. Pruitt also recommended that Deborah be subjected to drug testing.

In opposition to the OSC, Deborah submitted a declaration detailing the alleged lack of contact by Daryl with C.W. and Daryl's arrest for drunk and disorderly conduct on a night when C.W. was staying with him. With regard to the drug use allegations, Deborah stated that she was a flight attendant who was regularly tested for drugs and alcohol and had recently received a clear test result.

The hearing on Daryl's OSC was held in January 2005. At the hearing, Pruitt testified to the matters stated in her report and her recommendations. The court then heard argument from the parties on custody, support, and the request for drug testing. After hearing argument, the court denied Daryl's request for a change of custody. However, the court made that order conditioned upon Deborah submitting to hair follicle drug testing. The court ordered that a failure to submit to the drug testing would result in C.W. being placed in Daryl's physical custody. The court further ordered that if Deborah complied and the test came back positive, the parties were to appear for a further hearing to determine what action should be taken.

Deborah thereafter filed a motion for reconsideration, arguing that the court's order exceeded its authority because, under section 3041.5(a), the court only had authority to order a urine, not a hair follicle, test. In support of that motion she lodged the results of a urine test she took on January 7, 2005, that was negative for marijuana, cocaine, amphetamines, opiates and PCP.

A hearing was held on January 25, 2005. After hearing argument, the court denied Deborah's motion, finding that section 3041.5(a) allowed for a hair follicle test. However, the court ordered the matter stayed pending resolution by this court of Deborah's petition.

## DISCUSSION

Deborah asserts that the court erred in ordering her to have a hair follicle drug test under section 3041.5(a), as that section only allows urine tests. We conclude that because section 3041.5(a) requires any court-ordered drug testing to conform to federal drug testing procedures and standards, and those federal standards at present only allow for urine tests, the court erred in ordering Deborah to submit to hair follicle testing.[3]

### I. *Standard of Review*

■ Because on this petition we are charged with interpreting a statutory provision, on undisputed facts, our review is the independent de novo standard. (*Murphy v. Padilla* (1996) 42 Cal.App.4th 707, 711 [49 Cal.Rptr.2d 722]; see also *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1502 [82 Cal.Rptr.2d 368] ["[w]e independently construe statutory law, as its interpretation is a question of law on which we are not bound by the trial court's analysis"].)

### II. *Principles of Statutory Interpretation*

■ "We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] 'In determining intent, we look first to the language of the statute, giving effect to its "plain meaning." ' [Citations.] Although we may properly rely on extrinsic aids, we should first turn to the words of the statute to determine the intent of the Legislature. [Citation.] Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.]" (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672]; see also *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299] ["[i]f the [statutory] language is clear and unambiguous[,] there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature"].)

"[I]f the statutory language permits more than one reasonable interpretation, courts may consider various extrinsic aids, including the purpose of the

---

[3] Deborah asserts for the first time in her reply brief that section 3041.5 is unconstitutional because it does not contain any substantive or procedural guidelines for drug testing, only incorporating them by reference to federal regulations. However, we will not address this contention as Deborah failed to raise this issue in her opening brief, thereby not giving the real party in interest a chance to respond to her arguments. (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894 [93 Cal.Rptr.2d 364]; *Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794 [67 Cal.Rptr.2d 350].)

statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. [Citation.] In the end, we ' "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003 [111 Cal.Rptr.2d 564, 30 P.3d 57]; see also *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1165–1166 [278 Cal.Rptr. 614, 805 P.2d 873].) The legislative history of section 3041.5(a) is entitled to great weight. (See *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 16–18 [26 Cal.Rptr.2d 834, 865 P.2d 633].)

### III. *Analysis*

■ Section 3011, subdivision (d) (section 3011(d)) provides that in determining the best interests of a child in custody proceedings in a marital dissolution action, the court shall consider various relevant factors including the "habitual or continual illegal use of controlled substances or habitual or continual abuse of alcohol by either parent." The statute also provides in pertinent part: "Before considering these allegations, the court may first require *independent corroboration,* including, but not limited to, written reports from law enforcement agencies, courts, probation departments, social welfare agencies, medical facilities, rehabilitation facilities, or other public agencies or nonprofit organizations providing drug and alcohol abuse services." (*Ibid.,* italics added.)

In *Wainwright v. Superior Court* (2000) 84 Cal.App.4th 262 [100 Cal.Rptr.2d 749] (*Wainwright*), the mother alleged that the father was an unfit parent, and claimed that the father had grown marijuana in early 1995 and had been convicted of possessing a large quantity of marijuana sometime before 1995. (*Id.* at p. 264.) The mother also asserted that their minor son had returned from visits with father in 1997 smelling of marijuana and talking about watering plants on the father's farm. (*Ibid.*) The father denied the mother's allegations. The mother requested drug testing of the father, and the father objected. (*Id.* at p. 265.) The mother asserted that drug testing was authorized by section 3011(d)'s statement that the court shall consider a parent's " 'habitual or continual illegal use of controlled substances' " in determining issues of child custody. (*Wainwright, supra,* 84 Cal.App.4th at p. 265.) The trial court ordered the father to submit to a hair follicle drug analysis. The court found that section 3011(d) authorized drug tests and "that the interests of a child outweigh the privacy interests of a parent suspected of drug use." (*Wainwright, supra,* 84 Cal.App.4th at p. 265.)

The Court of Appeal in *Wainwright* vacated the trial court's order, holding that a family court's power to require " 'independent corroboration' " before

considering allegations of a parent's drug or alcohol abuse did not authorize the court to order drug testing. (*Wainwright, supra,* 84 Cal.App.4th at p. 269.) "Nothing in the words, purpose, or legislative history of section 3011, subdivision (d) authorizes court-ordered drug testing unchecked by substantive and procedural guidelines." (*Wainwright, supra,* 84 Cal.App.4th at p. 266, fn. omitted.)

The *Wainwright* court also noted that "[i]nterpreting section 3011, subdivision (d) to permit court-compelled drug testing in child custody disputes would present serious constitutional concerns. Governmentally compelled drug testing implicates the federal and state right to be free of unreasonable searches and seizures, and the state right of privacy. (U.S. Const., 4th Amend.; Cal. Const., art. I, §§ 1, 13; *Loder v. City of Glendale* (1997) 14 Cal.4th 846, 876, 896 [59 Cal.Rptr.2d 696, 927 P.2d 1200].)" (*Wainwright, supra,* 84 Cal.App.4th at p. 267.) To construe section 3011(d) as permitting court-ordered drug testing in child custody matters "would create serious constitutional difficulties, given the provision's lack of any substantive or procedural guidelines." (*Wainwright, supra,* 84 Cal.App.4th at p. 268.) The *Wainwright* court also noted that if it were to interpret section 3011(d) as permitting court-ordered drug testing in custody disputes, testing could occur "upon a bare allegation of drug use and without any statutory limitations on the type of test (blood, urine or hair), the manner of administering the test, or the disclosure of test results." (*Wainwright, supra,* 84 Cal.App.4th at p. 268.) "[S]ection 3011, subdivision (d) does not mandate confidentiality, nor any other procedures to achieve a proper balance between a parent's privacy interests, the degree of intrusion, and the state's interest in protecting child welfare. We will not construe a statute in a manner that creates doubts as to its constitutional validity." (*Wainwright, supra,* 84 Cal.App.4th at p. 268, fn. omitted.) The court noted, however, that: "We leave for another day whether court-ordered testing pursuant to more stringent procedural safeguards might pass constitutional muster." (*Id.* at p. 268, fn. 3.)

In response to the *Wainwright* decision, in 2004 the Legislature enacted section 3041.5. (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1108 (2003–2004 Reg. Sess.) May 6, 2003, p. 1.) Section 3041.5(a) provides: "In any custody or visitation proceeding brought under this part, as described in Section 3021, the court may order any parent who is seeking custody of, or visitation with, a child who is the subject of the proceeding to undergo testing for the illegal use of controlled substances and the use of alcohol if there is a judicial determination based upon a preponderance of evidence that there is the habitual, frequent, or continual illegal use of controlled substances or the habitual or continual abuse of alcohol by the parent or legal custodian. This evidence may include, but may not be limited to, a conviction within the last five years for the illegal use or possession of a controlled substance. *The court shall order the least intrusive method of testing* for the illegal use of

controlled substances or the habitual or continual abuse of alcohol by either or both parents or the legal custodian. If substance abuse testing is ordered by the court, *the testing shall be performed in conformance with procedures and standards established by the United States Department of Health and Human Services for drug testing of federal employees*. The parent or legal custodian who has undergone drug testing shall have the right to a hearing, if requested, to challenge a positive test result. A positive test result, even if challenged and upheld, shall not, by itself, constitute grounds for an adverse custody decision. Determining the best interests of the child requires weighing all relevant factors. The results of this testing shall be confidential, shall be maintained as a sealed record in the court file, and may not be released to any person except the court, the parties, their attorneys, the Judicial Council (until completion of its authorized study of the testing process) and any person to whom the court expressly grants access by written order made with prior notice to all parties. Any person who has access to the test results may not disseminate copies or disclose information about the test results to any person other than a person who is authorized to receive the test results pursuant to this section. Any breach of the confidentiality of the test results shall be punishable by civil sanctions not to exceed two thousand five hundred dollars ($2,500). The results of the testing may not be used for any purpose, including any criminal, civil, or administrative proceeding, except to assist the court in determining, for purposes of the proceeding, the best interest of the child pursuant to Section 3011, and the content of the order or judgment determining custody or visitation. The court may order either party, or both parties, to pay the costs of the drug or alcohol testing ordered pursuant to this section. As used in this section, 'controlled substances' has the same meaning as defined in the California Uniform Controlled Substances Act, Division 10 (commencing with Section 11000) of the Health and Safety Code." (Italics added.)

Prior to enacting section 3041.5, the Assembly Committee on Judiciary met to discuss an early draft of Assembly Bill No. 1108, which became section 3041.5, and the constitutional concerns regarding drug testing raised in the *Wainwright* decision. At that hearing, the American Civil Liberties Union (ACLU) expressed opposition, stating: [Assembly Bill No.] 1108 lacks substantive or procedural guidelines, other than providing that the drug and alcohol test be sealed" The Assembly Committee on Judiciary thereafter noted that: "[Assembly Bill No.] 1108 contains no provision as to *the type of test to be administered*, the manner of administering the test, or indeed, even the procedures by which a party may request drug testing to be ordered and the court consider the request. Moreover, it is unclear that the confidentiality provisions of the bill will be effective." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1108 (2003–2004 Reg. Sess.) as amended Apr. 28, 2003, p. 5, italics added.)

At the June 2, 2003 session of the Assembly, the author of the bill introduced an amended version of Assembly Bill No. 1108 that addressed some of the concerns of the *Wainwright* court and the ACLU. Specifically, that amendment added the language "[t]he court shall order the least intrusive method of testing for the illegal use of controlled substances or the habitual or continual abuse of alcohol by either or both parents or legal custodian." (Legis. Counsel's Dig., Assem. Bill No. 1108 (2003–2004 Reg. Sess.) 19 Stats. 2004, Summary Dig., p. 96, italics omitted.) That amendment also addressed the concern that section 3041.5's confidentiality provisions would not be effective, adding the language "[a]ny breach of the confidentiality of the test results shall be punishable by civil sanctions not to exceed two thousand five hundred dollars ($2,500)." (Legis. Counsel's Dig., Assem. Bill No. 1108 (2003–2004 Reg. Sess.) 19 Stats. 2004, Summary Dig., p. 96.)

Assembly Bill No. 1108 was further amended by the Senate to address the constitutional concerns of *Wainwright,* and those voiced by the ACLU, adding the text: "If substance abuse testing is ordered by the court, the testing shall be performed in conformance with procedures and standards established by the United States Department of Health and Human Services for drug testing of federal employees." (Legis. Counsel's Dig., Sen. Conc. Amends. to Assem. Bill No. 1108 (2003–2004 Reg. Sess.) p. 95.)

Daryl argues that the fact that the Legislature elected not to specify the type of allowable test(s), despite the ACLU's criticism, only limiting it to the "least intrusive method of testing," evidences an intent that courts could use hair follicle tests, not just urine tests. Deborah responds that because section 3041.5 requires that testing be done "in conformance with procedures and standards" developed by the federal government for drug testing of federal employees, and because those procedures and standards at present only allow urine tests, hair follicle tests are prohibited. Deborah's position is well taken.

■ "The Mandatory Guidelines for Federal Workplace Drug Testing Programs (Mandatory Guidelines) establish the scientific and technical guidelines for Federal workplace drug testing programs and standards for certification of laboratories engaged in urine drug testing for Federal agencies, under authority of section 503 of [Public Law] 100-71, 5 [United States Code] 7301 note, and [Executive Order] No. 12564. The Mandatory Guidelines were first published in the Federal Register on April 11, 1988 (53 Fed.Reg. 11979), and revised on June 9, 1994 (59 Fed.Reg. 29908), and on November 13, 1998 (63 Fed.Reg. 63483)." (69 Fed.Reg. 19644 (Apr. 13, 2003).)

As of this date, the federal government only allows urine tests under the Mandatory Guidelines, and, indeed, the Mandatory Guidelines were recently amended to place stricter controls on laboratories conducting urine tests. (66

Fed.Reg. 43876–43882 (Aug. 21, 2001); 69 Fed.Reg. 19644–19645 (Apr. 13, 2004).) The Mandatory Guidelines provide strict and comprehensive standards for urine testing. (*Ibid.*)

It is also true that the federal government has been considering alternative testing methods for some years. However, although proposed, they have not yet become established standards, and, until that occurs, the present version of the Mandatory Guidelines allowing only urine testing governs: "The [United States] Department [of Health and Human Services (sometimes hereafter the Department)] is revising the Mandatory Guidelines here concerning the determination of the validity of urine specimens. In another document published along with this revision, the Department is proposing to revise the Mandatory Guidelines again to add *alternative specimens*, instrumented initial test facilities, and point of collection testing. [¶] The alternative specimen proposal will be subject to a 90-day comment period after which the Department will consider the comments received and issue a final revision. *Until the final revision on alternative specimens is issued, the Mandatory Guidelines as contained in this revision govern.*" (69 Fed.Reg. 19644 (Apr. 13, 2004), italics added.)

The most recent publication in the Federal Register on this issue is dated April 13, 2004, and is entitled *Proposed Revisions to Mandatory Guidelines for Federal Workplace Drug Testing Programs.* In pertinent part its states: "The Department of Health and Human Services . . . is proposing to establish scientific and technical guidelines for the testing of *hair*, sweat, and oral fluid specimens *in addition to urine specimens.*" (69 Fed.Reg. 19673 (Apr. 13, 2004), italics added.) The text goes on in great detail to discuss the origins of these proposed changes, the efficacy of the various proposed additional methods, and the new proposed standards for those methods of testing. (*Id.* at pp. 19673–19677, 19679–19680, 19696, 19698, 19699, 19701–19702, 19705–19716.) Similar to the Mandatory Guidelines on urine tests, the proposed standards are comprehensive and include such standards as how much hair is to be collected, what tests are to be performed on hair samples to determine their integrity, what criteria are used to report a hair sample that is adulterated or is an invalid result, privacy requirements for collecting hair samples, the procedure for collecting hair samples, how a laboratory becomes certified to conduct hair sample tests, how the hair tests are to be conducted, and how they are reported. (*Id.* at pp. 19696, 19698, 19699, 19701–19702, 19705–19716.)

█ Given the comprehensive nature of the Mandatory Guidelines and their strict standards, the requirement that the drug testing under section 3041.5 must comply with those standards is one of the most important ways in which the Legislature addressed the constitutional problems of court-ordered drug testing raised by the *Wainwright* court. We must presume that

the Legislature was aware of the text of the Mandatory Guidelines when it enacted section 3041.5 and incorporated those provisions by reference. (*People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 199 [96 Cal.Rptr.2d 463, 999 P.2d 686] [courts must assume that when enacting a statute the Legislature was aware of existing related laws].) We therefore must also assume that the Legislature was aware at the time it enacted section 3041.5 that only urine tests were allowed, and only under those strict guidelines. It becomes clear that in enacting section 3041.5 the reason the Legislature did not specify the types of tests that could be conducted was because the Mandatory Guidelines *did.*

■  The language "least intrusive method of testing" does not show an intent by the Legislature to allow *any* type of available testing. Rather, it is apparent that it was designed to address another of *Wainwright's* concerns, that to pass constitutional muster, the intrusiveness of the testing must be weighed, along with the individual's legitimate expectation of privacy, the nature and immediacy of the government concern at issue, and the efficacy of drug testing in meeting that concern. (*Wainwright, supra,* 84 Cal.App.4th at pp. 267–268.) Thus, the only reasonable interpretation of that clause is that *if and when* additional tests are permitted, the least intrusive method must be used.

■  Indeed, if we were to interpret section 3041.5 as not limiting the types of allowable tests, it would lead to absurd and perhaps unconstitutional results. Persons could be subjected to any manner of test, without any guarantee of efficacy or standards for its administration, since the federal Mandatory Guidelines only provide procedures and standards for urine tests. Indeed, such an interpretation would lead to the anomalous result that urine tests under section 3041.5 would be subject to the stringent federal standards contained in the Mandatory Guidelines, but any other test—whether it be hair follicle, sweat, oral fluid, or other—would be subject to no standards at all. This lack of procedure and standards is precisely the constitutional infirmity pointed out by *Wainwright* that the Legislature sought to address in enacting section 3041.5. We must interpret section 3041.5 in a manner " ' "that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Torres v. Parkhouse Tire Service, Inc., supra,* 26 Cal.4th at p. 1003.) Additionally, we must not "construe a statute in a manner that creates doubts as to its constitutional validity." (*Wainwright, supra,* 84 Cal.App.4th at p. 268.)

■  Because section 3041.5 requires testing to be performed in conformance with the procedures and standards established by the Department of Health and Human Services and its Mandatory Guidelines at present only

allow urine tests, we conclude that the court erred in requiring Deborah to take a hair follicle test pursuant to the terms of section 3041.5(a).

## DISPOSITION

Let a writ of prohibition issue directing the superior court to vacate its order of January 25, 2005, compelling a hair follicle drug test. The stay issued by this court on February 17, 2005, is hereby vacated. This decision will become final as to this court 10 days after the filing date. (Cal. Rules of Court, rule 24(b)(3).) Costs to petitioner.

Huffman, Acting P. J., and Aaron, J., concurred.