Filed 7/28/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| HEIDI S., | B263933 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BF044161) |
| v. | |
| DAVID H., | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, B. Scott Silverman, Judge.  Affirmed.

Opri & Associates and Debra A. Opri for Plaintiff and Appellant.

Kearney | Baker and Gary W. Kearney for Defendant and Respondent.

————————————

On November 5, 2012, police discovered Heidi S. (mother) in a public park under the influence of alcohol and controlled substances; mother was holding her 17-month-old son (the child) in her arms. On March 4, 2014, following an investigation by the Los Angeles County Department of Child and Family Services (DCFS) and a dependency court proceeding, the juvenile court awarded David H. (father) sole legal and physical custody of the child, granted mother limited visitation with the child under the supervision of a monitor, and terminated jurisdiction over the child (Exit Order).

On May 29, 2014, less than three months later, on the basis of allegedly changed circumstances since the issuance of the Exit Order, mother filed in the family court a request to modify the Exit Order. Mother requested joint legal custody, sole physical custody, and unmonitored visitation.

On March 3, 2015, Judge B. Scott Silverman of the family court found a significant change of circumstances that warranted modification of the Exit Order to permit mother increased monitored visitation and, for the first time, to permit mother unmonitored visitation (Custody Order). Nevertheless, due to continuing concerns about mother that had not been sufficiently resolved—e.g., mother's unexplained seizures and the risk that mother might relapse into drug or alcohol abuse—the family court ordered that sole legal and physical custody of the child would remain with father. The Custody Order also required that mother submit to additional testing for the illegal use of controlled substances and for the use of alcohol as a condition to further visitation.

Mother appeals, contending that the family court abused its discretion under Welfare and Institutions Code section 302, subdivision (d), in refusing to grant her request for custody and for visitation in its entirety. She also contends that the family court violated Family Code section 3041.5 with respect to its imposition of new testing requirements for controlled substances and for alcohol; she further contends that this alleged violation constitutes a denial of due process. Her arguments concerning Family Code section 3041.5 present issues of first impression.

We affirm the family court's rulings on all issues.

2

# BACKGROUND

## I.      Relevant statutory provisions

Welfare and Institutions Code section 302, subdivision (d) provides as follows: "Any custody or visitation order issued by the juvenile court at the time the juvenile court terminates its jurisdiction pursuant to Section 362.4 regarding a child who has been previously adjudged to be a dependent child of the juvenile court shall be a final judgment and shall remain in effect after that jurisdiction is terminated.  The order shall not be modified in a proceeding or action described in Section 3021 of the Family Code unless the court finds that there has been a significant change of circumstances since the juvenile court issued the order and modification of the order is in the best interests of the child."

Family Code section 3041.5 provides the following:  "In any custody or visitation proceeding brought under this part, as described in Section 3021, or any guardianship proceeding brought under the Probate Code, the court may order any person who is seeking custody of, or visitation with, a child who is the subject of the proceeding to undergo testing for the illegal use of controlled substances and the use of alcohol if there is a judicial determination based upon a preponderance of evidence that there is the habitual, frequent, or continual illegal use of controlled substances or the habitual or continual abuse of alcohol by the parent . . . .  This evidence may include, but may not be limited to, a conviction within the last five years for the illegal use or possession of a controlled substance.  The court shall order the least intrusive method of testing for the illegal use of controlled substances or the habitual or continual abuse of alcohol . . . .  The parent . . . who has undergone drug testing shall have the right to a hearing, if requested, to challenge a positive test result.  A positive test result, even if challenged and upheld, shall not, by itself, constitute grounds for an adverse custody or guardianship decision.  Determining the best interests of the child requires weighing all relevant factors. . . .  The results of the testing may not be used for any purpose, including any criminal, civil, or administrative proceeding, except to assist the court in determining, for purposes of the proceeding, the best interest of the child pursuant to Section 3011 and the content of the

order or judgment determining custody or visitation.  The court may order either party, or both parties, to pay the costs of the drug or alcohol testing ordered pursuant to this section."

## II.     Facts of the case

On November 5, 2012, the Los Angeles police received several phone calls from concerned citizens reporting that they had seen a woman in a public park with a baby and that she had almost dropped the baby several times.  After arriving at the park and finding mother, the police administered two breathalyzer tests to determine mother's blood-alcohol level; the tests revealed that mother had a blood-alcohol level of .11 or .12.  Mother told the police that earlier in the day she had consumed "two beers" and two pills containing Norco, a pain reliever, within a two-hour period.  The police arrested mother for child endangerment.

On the same day, after her arrest, during an interview with the DCFS social worker assigned to investigate the incident, mother stated that she had consumed beer and a Norco pill earlier that day and that the night before she had ingested a medication called Seroquel.

On November 6, 2012, mother told the same DCFS social worker that before going to the park the previous day, she had intended to ingest a Norco pill but she had mistakenly consumed a pill containing Ambien, a sedative.  Mother stated that she could not remember any of the events that occurred on November 5, 2012 after she had taken the Ambien pill, including traveling to the park with her son and being arrested by the police.

Shortly after DCFS's interviews with mother, DCFS filed a petition in the juvenile court asking the court to open a case concerning the child and requesting that the police or a social worker remove the child from mother's care.  On or about November 14, 2012, in case No. CK96444, the juvenile court held the first detention hearing, pursuant to section 319 of the Welfare and Institutions Code, in the matter concerning the child.

4

On March 4, 2014, following a dependency proceeding,[1] the juvenile court issued the Exit Order, awarding father sole legal and physical custody of the child. The Exit Order permitted mother supervised visitation with the child for "2 hours 3 times per week." The Exit Order stated that mother's visitations with the child "must be supervised" by a monitor, that the selection of the monitor must be "agreed upon by the parties," and that "[i]f there is no agreement, then father may choose monitor, or mother to use professional monitor, paid for by mother." The Exit Order also required mother to complete a "drug abuse treatment program with random testing" and to "continue counseling and psychiatrist care." The juvenile court terminated jurisdiction over the child and held that any request to modify the Exit Order must be brought in the family court.

### III.   Procedural history

On May 29, 2014, not even a full three months after the issuance of the Exit Order, in case No. BF044161, mother filed in the family court a request to modify the Exit Order. In the request, mother sought joint legal custody, sole physical custody, and visitation described as "50% custodial arrangement with the respondent [father] based upon work schedules and flexibility." (Capitalization omitted.)

With the request, mother filed a declaration asserting that a material change of circumstances had occurred since the juvenile court issued its Exit Order and that the requested modification of the Exit Order would be in the child's best interests. First, mother asserted that she had completed the "Social Services case plan, and in fact, ha[d] successfully gone above and beyond what was required." Since December 2013, she had consistently attended individual counseling and therapy sessions with a clinical psychologist, Dr. Lester Summerfield; in addition, a psychiatrist had treated mother once every three weeks. She had completed 18 months of DCFS-monitored drug testing with

---

[1] The appellate record is silent on the subsequent events leading up to the juvenile court's Exit Order.

negative results from December 2012 to March 4, 2014;[2] after that interval, she continued to submit to drug testing on her own volition, including testing based on urine, blood, and hair follicle samples—all with negative results. She also attended an outpatient drug and alcohol treatment program from April 3, 2013 to May 30, 2013, successfully completed that program, attended 20 Alcoholics Anonymous meetings, and completed a parenting course. Further, mother's declaration claimed that mother's monitored visits with the child have proceeded "extremely well." On August 13, 2014, mother filed a supplemental declaration attaching clinical psychologist Dr. Marlene W. Valter's psychological evaluation of mother.

On August 11, 2014, in opposition to mother's request to modify the Exit Order, father filed his own declaration explaining his concerns about mother's ability to care for the child. He first cited an Evidence Code section 730 Evaluation ordered by the dependency court: in that evaluation, the court-ordered expert concluded that mother is a "'very disturbed person'" with "'psychopathic tendencies,'" that she "'suffers from a "[m]ixed [p]ersonality [d]isorder with [a]ntisocial and [n]arcissistic traits,"'" that she "'is a "serious and dangerous risk to her young son,"'" and that she "has a potential 'for homicide of the child.'" (Boldface omitted.)

Father's declaration then reminded the family court that the court-ordered expert had requested a Department of Justice (DOJ) report concerning mother, which revealed that mother had been "doctor shopping." (Boldface omitted.) Mother had received treatment from six different physicians and received medication from at least four different pharmacies at the same time, including Ambien, Lunesta, Codeine, Promethazine, Vicodin, Olonazepam, Ativan, Xanax, and Ritalin; she had filled a prescription as recently as September 4, 2013. The DOJ report therefore expressed concern about the validity of mother's negative results from drug testing taken during the

---

[2] There are only 15 months between December 2012 to March 4, 2014; mother does not explain this discrepancy in her briefs.

6

same period that she had been receiving prescriptions for at least nine different medicines; the report suggested that mother may be altering the results of her drug testing. Father's declaration then cited the witness statement by mother's childhood friend Timothy Sanchez; Mr. Sanchez stated that he had observed mother purchase synthetic urine in order to pass a drug test, seemingly confirming the concerns related to altered drug testing results expressed in the DOJ report.

In the declaration, father also cited a letter from Dr. Lawrence Genen, one of mother's four psychiatrists during the time that mother had been "doctor shopping." Dr. Genen had treated mother since her arrest in November 5, 2012. Although Dr. Genen initially supported mother during the dependency court proceeding, on September 23, 2013, Dr. Genen informed DCFS that he had terminated his treatment of mother because "she is abusing prescription controlled substances." (Boldface omitted.) He also reported to DCFS that he "would not recommend unsupervised visitation with her son." (Boldface omitted.)

Further, father's declaration asserted that the parenting course relied on by mother was an online course; the only in-person parenting course that mother attended was the court-mandated one. During the court-mandated parenting course, reports described mother as "walking off balance, holding onto the walls for support, disoriented, and hav[ing] slur[red] speech." (Boldface omitted.) The representative of the court-mandated parenting course stated that she did not recommend permitting mother to have unmonitored visits with the child.

Finally, father expressed concerns about the credibility of the clinical psychologist, Dr. Summerfield, whose January 24, 2014 recommendation letter mother relied on in her declaration to the family court; father asserted that Dr. Summerfield had provided false information to the dependency court during the earlier proceeding.[3]

---

[3] Dr. Summerfield's letter claimed that mother had survived a plane crash causing the death of her friend and the pilot and that he had diagnosed mother with chronic posttraumatic stress disorder. When asked during the dependency proceeding for more

7

Further, because mother relied on the same seven-month-old letter of recommendation previously-filed in the dependency proceeding, father also questioned whether Dr. Summerfield's opinion constituted new evidence describing events that occurred after the issuance of the Exit Order.

On November 4, 2014, the family court began the hearing on mother's request to modify the Exit Order. Mother presented the testimony of clinical psychologists Dr. Valter and Dr. Summerfield; the family court then continued the matter to the next day. On November 5, 2014, mother presented the testimony of Phyllis Block, the monitor who supervised mother's visitations with the child; mother also testified; then, the family court continued the matter to later in the month.

On November 21, 2014, after mother completed her testimony, father presented the testimony of the nanny for the child; father also testified. The family court continued the matter to the next month. On December 12, 2014, father completed his testimony and then presented the testimony of the following witnesses: Ann Rosato, the DCFS social worker who handled the DCFS investigation during the dependency proceeding; Nils Grevillius, the private investigator who father hired to investigate the alleged existence of three coworkers who had written recommendation letters supporting mother in the dependency matter; and mother. The family court continued the matter to the next year. On February 4, 2015, father presented the testimony of Mr. Sanchez, mother's childhood friend; the family court then continued the matter another month.

On March 3, 2015, nearly a year after the juvenile court issued the Exit Order, the family court heard closing arguments from the parties and then stated on the record its

---

evidence supporting the occurrence of the plane crash, Dr. Summerfield cited a lawsuit based on mother's claim that a liquid had injured mother's head when she had boarded a gated plane. Dr. Summerfield later admitted that he had made an error in his letter when he claimed that mother had been in a plane accident.

findings of fact, its conclusions of law, and its ruling on mother's request to modify the Exit Order.[4]

Consistent with the family court's oral rulings at the hearing, the Custody Order made no modification to the Exit Order's award of sole legal and physical custody to father. However, the Custody Order modified the visitation schedule by creating a three-tiered system in order to phase out gradually the monitored visitation and to phase in unmonitored visitation.

In the first tier, from March 14, 2015 to July 3, 2015,[5] mother had monitored visitation on alternating weekends from Saturday 9:00 a.m. through Sunday 6:00 p.m., with a monitor present on both days from 9:00 a.m. to 6:00 p.m.; on the weeks without a weekend visitation, mother had a monitored visit on Friday from 3:00 p.m. to 6:00 p.m. The order required mother to submit to four random tests per month for the illegal use of controlled substances and for the use of alcohol; the order required mother to pay for those tests. The order further stated: "If mother misses one test or receives a positive drug test, then visitation shall resume back to the monitored schedule of six hours per week."[6]

Following successful completion of the first tier, in the second tier from July 4, 2015 to October 9, 2015, mother had *un*monitored visitation on alternating weekends from Saturday 9:00 a.m. through Sunday 6:00 p.m; on the weeks without a weekend visitation, mother had a monitored visit on Friday from 3:00 p.m. to 6:00 p.m. The order increased the random drug and alcohol testing to six tests per month "continuing indefinitely." Again, the order mandated that mother pay for those tests; further, "[i]f

---

[4] We present a more detailed summary of the family court's statements during the hearing in the Discussion section below.

[5] At oral argument, counsel represented to this court that during the pendency of this appeal the Custody Order's three-tiered plan has been in effect.

[6] We presume that the family court intended that a positive result from an alcohol test would also lead to a return to the monitored visitation schedule of six hours per week.

mother misses one test or receives a positive drug/alcohol test, then visitation shall resume back to the monitored schedule of six hours per week."

After completion of the second tier, in the third tier starting on October 10, 2015 and requiring an open-ended period, mother has *un*monitored visitation on alternating weekends from Saturday 9:00 a.m. through Sunday 6:00 p.m. and every Wednesday "from after school to 7:00pm." The testing for controlled substances and for alcohol that began in the second tier remained in effect. The Custody Order also implemented a schedule for holidays, for attendance at school functions and at school activities, and for telephonic contact with the child when the child is in the other parent's custodial care.

Mother filed an appeal from the Custody Order; father did not appeal the order.

## DISCUSSION

### I.   The family court did not abuse its discretion in refusing to grant mother's request for custody and for visitation in its entirety.

#### A.   *Standard of review*

As trial courts have broad powers and have the widest discretion to fashion a custody and visitation plan that is in the child's best interest, we employ the deferential abuse of discretion standard of review on a trial court's ruling on custody and on visitation. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32.) "The trial judge, having heard the evidence, observed the witnesses, their demeanor, attitude, candor or lack of candor, is best qualified to pass upon and determine the factual issues presented by their testimony." (*In re Marriage of Lewin* (1986) 186 Cal.App.3d 1482, 1492.) An abuse of discretion occurs when the trial court exceeds the bounds of reason; even if we disagree with the trial court's determination, we uphold the determination so long as it is reasonable. (*Stull v. Sparrow* (2001) 92 Cal.App.4th 860, 864.) We do not reverse unless a trial court's determination is arbitrary, capricious, or patently absurd.

#### B.   *Finding a significant change of circumstances since the juvenile court issued the Exit Order, the family court modified the Exit Order.*

In order to modify a juvenile court's exit order, the family court must first make a finding that "there has been a significant change of circumstances since the juvenile court

10

issued the order and modification of the order is in the best interests of the child." (Welf. & Inst. Code, § 302, subd. (d).) As a threshold matter, the parties dispute whether the family court even made a "significant change of circumstances" finding and as a consequence whether the family court did or did not modify the Exit Order pursuant to Welfare and Institutions Code section 302, subdivision (d).

Mother asserts that the family court did make express factual findings of substantially changed circumstances, citing the family court's statements during the hearing discussing the monitor's favorable reports of mother's visitations with the child, the negative results from mother's drug and alcohol testing, and the supporting opinions of her clinical psychologists Dr. Valter and Dr. Summerfield, which all occurred after the issuance of the Exit Order. Further, mother asserts that the family court did modify the Exit Order, for example, in increasing the frequency and the length of her visitations with the minor, and that the family court expressly stated so: "The Court modifies the current visitation schedule."

Father disagrees, citing the family court's statements at the hearing that although it found evidence warranting a change in the visitation schedule, it had remaining concerns regarding mother that prohibited it from granting her request to change the custody arrangement. In other words, father appears to argue that a finding of substantially changed circumstances is not a prerequisite to modifying a visitation schedule, and that only a modification to a custody arrangement requires such a finding. He also appears to argue that if the family court had found substantially changed circumstances, it would have modified the custody arrangement, but the absence of any change in the custody award signifies that the family court made no finding of changed circumstances.

Father incorrectly relies on the general rule applicable in family court that the family court can modify a visitation order, but not a custody order, without first finding a substantial change of circumstances since the prior order. (*In re Marriage of Lucio* (2008) 161 Cal.App.4th 1068, 1072, 1077.) In fact, the relevant statutory provision, Welfare and Institutions Code section 302, subdivision (d), imposes a greater burden when a family court modifies a juvenile court's exit order, requiring that for

11

modifications to *either* a "custody or visitation order" the family court must first find a significant change of circumstances since the juvenile court's issuance of the exit order. (Welf. & Inst. Code, § 302, subd. (d); *In re Marriage of David & Martha M.* (2006) 140 Cal.App.4th 96, 98, 101–103.)  Thus, before modifying the visitation schedule set forth in the Exit Order, the family court must find a significant change of circumstances that warrants that modification.

In this case, during the March 3, 2015 hearing, the family court addressed at length the post-Exit Order changed circumstances that had occurred, including the favorable reports by the monitor who oversaw the weekly visits between mother and the minor, the numerous and consistent drug and alcohol testing with negative results, the favorable opinion of the psychologist who counseled mother every week for the majority of the past year, mother's continued employment stability, and the absence of any further incident by mother with law enforcement.  After acknowledging the standard requiring substantially changed circumstances as a precondition for modification of the Exit Order, the family court stated that "there [has] been sufficient evidence in the Block reports and the history of testing to warrant this court, at this point in time, a year after . . . the conclusion of the dependency proceedings, to consider altering the visitation arrangement that is currently in place."  The family court then described the new visitation schedule at length.  Further, the court order that issued on the same day expressly stated that the "Court modifies the current visitation schedule."  Indeed, by substantially increasing mother's monitored visitation with the child and by permitting her unmonitored visitation with the child for the first time, the Custody Order unequivocally modified the visitation schedule.

For the foregoing reasons, we easily reject father's argument on this issue.

*C.      The family court did not abuse its discretion in refusing to grant mother's request for custody and for visitation in its entirety.*

Mother asserts on appeal that by relying too heavily on the events occurring before the juvenile court issued the Exit Order and by not relying sufficiently on the changed circumstances after the Exit Order issued, the family court abused its discretion in not

12

permitting a greater increase in her visitation with father and in making no change to the Exit Order's award of exclusive custody of the child to father.

We briefly summarize the respective roles of the juvenile court and the family court with regard to an exit order. When a child is a dependent of the juvenile court, that court resolves all custody issues regarding the child (Welf. & Inst. Code, § 304) and provides "a forum to 'restrict parental behavior regarding'" the child and a forum to remove the child from the custody of the parents. (*In re Chantal S.* (1996) 13 Cal.4th 196, 201.) When the juvenile court terminates its jurisdiction, it issues an exit order "determining custody of, or visitation with, the child" that becomes part of an existing family law case or the basis for opening a family law file (Welf. & Inst. Code, § 362.4); the exit order "shall be a final judgment and shall remain in effect after [the juvenile court's] jurisdiction is terminated." (Welf. & Inst. Code, § 302, subd. (d).)

Once an exit order is in place, "'the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining' that custody arrangement." (*In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 956.) The family court may modify the exit order only if "the court finds that there has been a significant change of circumstances since the juvenile court issued the order and modification of the order is in the best interests of the child." (Welf. & Inst. Code, § 302, subd. (d).) Therefore, the moving party has a twofold burden to show a significant change of circumstances since the juvenile court issued the exit order and to show why the requested modification would be in the child's best interests.

In this case, the juvenile court's Exit Order awarded father sole legal and physical custody of the child and permitted mother very limited visitation of only two hours three times a week, conditioned upon a monitor's presence during the visitation; further, the Exit Order required mother to submit to a drug abuse treatment program with random drug testing as well as continued counseling and psychiatrist care. The Exit Order therefore reflected the juvenile court's clear concerns about mother's substance abuse problems, her mental and emotional states, and the effect on the child's well-being.

13

Failing to appeal that order, mother chose to request a modification of that order only a few months later; the family court appropriately expressed concerns that mother had improperly sought a reconsideration of the juvenile court's Exit Order. Due to multiple continuances of the modification hearing, however, by the end of the hearing, the parties had presented to the family court nearly a year's worth of data concerning mother's behavior since the issuance of the Exit Order.

At the end of the hearing, the family court provided a lengthy analysis of the events since the Exit Order issued and of how the family court weighed those factors in making its final determination on mother's request to modify the Exit Order. The court acknowledged mother's improved behavior since the issuance of the Exit Order, including the favorable reports by the monitor who oversaw the weekly visits between mother and the minor, the numerous and consistently negative results from mother's drug and alcohol testing, the favorable opinion of the psychologist who counseled mother every week for the majority of the previous year, mother's continued employment stability, and the absence of any incident with law enforcement.

Nevertheless, the court determined that three serious concerns remained unresolved and that mother had failed to address these concerns to the court's satisfaction. First, having observed mother's testimony at trial, the court maintained a substantial concern about mother's lack of credibility.[7] Second, the court had a concern about "assur[ing] the child's safety" in light of mother's unexplained seizures and whether mother could anticipate or control those seizures when the minor was in her care without a monitor's supervision. Finally, the court expressed "continuing concern" that

---

[7] We agree with the family court's consideration of mother's lack of credibility at the hearing as a valid factor to inform its ruling. However, we do not go so far as the family court in determining that a parent's seeming lack of veracity or a parent's failure to acknowledge her drug and alcohol addiction are themselves bases to determine whether mother can enjoy visitation with, or custody of, her own child.

mother might relapse, that is, return to her use of illegally consuming controlled substances or to her abuse of alcohol.

The court summarized its ruling: "There [has] been sufficient evidence in the Block reports and the history of testing to warrant this court, at this point in time, a year after . . . the conclusion of the dependency proceedings, to consider altering the visitation arrangement that is currently in place. There [are], however, significant concerns that I articulated . . . for me to conclude, one, that the court is not entertaining in any respect a change of primary custody in this case, and that substantially different evidence would be necessary. . . . [¶] Second, the court is not prepared to entertain a shared custody arrangement at this point. And at least at this point, frankly, that is the most ambition that I think either mother should aspire to someday or father should recognize is possible someday, is some shared custody arrangement. But . . . we're, again, far from that point. [¶] . . . I think it's appropriate to have significantly more hours for mother. The question is how I do that and assure the child's safety because of my concern about the . . . seizure incidents, which there had been at least one, and my continuing concern about the petitioner's risk of relapse unless she is under continued strict controls with respect to drug and alcohol abuse." The court then described the new three-tier visitation schedule.

Exercising reasonable judgment, the family court struck an appropriate balance in acknowledging that changed circumstances warranted modification of the visitation schedule but also determining that those changes did not justify the full remedy requested by mother, particularly her request for custody. That determination fell squarely within the broad discretion of the family court.

We find nothing in the family court's ruling to be arbitrary, capricious, or patently absurd.

Although mother asserts on appeal that the family court placed too much emphasis on the events occurring before the issuance of the Exit Order, the family court had a statutory obligation to consider the circumstances at the time the Exit Order issued in order to determine whether those circumstances had substantially changed to warrant a modification of the Exit Order. Mother's briefs effectively have urged that this reviewing

15

court re-weigh the evidence before the family court and make a determination more favorable to her; this we may not do.

Mother also asserts on appeal that the family court failed to consider the best interests of the child. Contrary to her assertion, the record shows that the family court properly considered the child's safety, as expressly explained by the family court at the hearing. The final ruling is consistent with the best interest of the child because it maintains continuity and stability by keeping the child in the sole physical custody of father. In light of the serious concerns stemming from mother's unexplained seizures and her risk of relapse, father's maintaining sole responsibility for decisions relating to the health, education, and welfare of the child[8] also serves the best interest of the child. Thus, we find no abuse of discretion regarding the family court's ruling on this point.

## II. The family court complied with Family Code section 3041.5.

Mother contends that by requiring her to submit to drug testing indefinitely as a condition to further visitation and by ordering that a positive drug test result would immediately trigger a return to the reduced visitation schedule imposed by the Exit Order, the family court violated Family Code section 3041.5.

### A. The family court must comply with Family Code section 3041.5 when modifying a juvenile court's Exit Order.

As a threshold matter, father argues that because the family court merely continues, extends, refines, and adjusts the Exit Order issued by the juvenile court, the family court need not comply with Family Code section 3041.5 and need only comply with the statutory requirements imposed upon the juvenile court, not the family court. Father cites no case law to support his argument. Instead, he argues that Family Code section 3041.5 only applies to custody or visitation proceedings brought under Family Code section 3021 but "[t]he proceedings which are the subject of this appeal

---

[8] "'Sole legal custody' means that one parent shall have the right and the responsibility to make the decisions relating to the health, education, and welfare of a child." (Fam. Code, § 3006.)

16

were . . . brought . . . under the special provision of the *Welfare and Institutions Code*." As we shall explain, father's argument is without merit.

Family Code section 3041.5 applies to "any custody or visitation proceeding brought under this part, as described in Section 3021." Family Code section 3021 provides that "[t]his part applies in any of the following:  (a) A proceeding for dissolution of marriage.  (b) A proceeding for nullity of marriage.  (c) A proceeding for legal separation of the parties.  (d) An action for exclusive custody pursuant to Section 3120. (e) A proceeding to determine physical or legal custody or for visitation in a proceeding pursuant to the Domestic Violence Prevention Act (Division 10 (commencing with Section 6200)). . . .  (f) A proceeding to determine physical or legal custody or visitation in an action pursuant to the Uniform Parentage Act (Part 3 (commencing with Section 7600) of Division 12).  (g) A proceeding to determine physical or legal custody or visitation in an action brought by the district attorney pursuant to Section 17404."

The parties do not argue that this family court proceeding (case No. BF044161) falls outside of Family Code section 3021.  Father admits that this action began when mother filed it shortly after the birth of the child "in order to establish parental relations" between the child and father.  Though the appellate record is sparse on the events occurring in the family court proceeding before mother's request to modify the Exit Order, the record does contain the family court's judgment for paternity, child custody, and visitation dated June 8, 2012, which issued before the November 5, 2012 incident in the public park which triggered the juvenile court proceeding.  Father's admission and the June 8, 2012 judgment show that the family court case (case No. BF044161) began before the juvenile court case (case No. CK96444) and that the two cases are separate proceedings.

Welfare and Institutions Code section 362.4 requires that the "order of the juvenile court shall be filed in the proceeding for nullity, dissolution, or legal separation, or in the proceeding to establish paternity, at the time the juvenile court terminates its jurisdiction over the minor, *and shall become a part thereof*."  (Italics added.)  Thus, once the juvenile court issued the Exit Order and its jurisdiction ended, the family court had the

17

responsibility to enforce the Exit Order.  But the family court proceeding remained a separate proceeding from the juvenile court proceeding.  The family court's Custody Order is a new and separate court order from the Exit Order; the superior court ruling that we review in this appeal is the family court's Custody Order, not the juvenile court's Exit Order.  The mere fact that Welfare and Institutions Code section 362.4 and section 302, subdivision (d), (defining the changed circumstances standard that the family court applies in modifying a juvenile court's exit order) are set forth in the Welfare and Institutions Code does not convert the family court proceeding into a juvenile court proceeding.  Therefore, father's assertion that "[t]he proceedings which are the subject of this appeal were brought . . . under the special provision of the *Welfare and Institutions Code*" is incorrect.

Our Supreme Court has explained that the juvenile court and the family court have different purposes and that different rules and statutes govern each court.  (*In re Chantal S.*, *supra*, 13 Cal.4th at pp. 206, 208, 210.)  In *Chantal S.*, the Supreme Court held that the juvenile court had the authority to issue an exit order indefinitely requiring the parent to participate in a counseling program even though the matter subsequently proceeded to the family court, which only had the authority to require counseling limited to one year.  (*Id.* at pp. 200, 208.)  Relevant to this case, the Supreme Court explained, "Courts are often placed in the position of enforcing orders of other courts, even though the enforcing court *could not have made the order in the first instance*, or *would not have present authority to issue the precise order*.  [Citations.]  If, as we conclude, the order was one that a juvenile court could properly make on termination of its dependency jurisdiction, the fact that the family court would be precluded from making that same order does not render the order unenforceable in the family court."  (*Id.* at pp. 208–209, italics added.)

Thus, contrary to father's assertion, the juvenile court and the family court each have specific statutory authority; the family court cannot "borrow" the authority of the juvenile court—whose jurisdiction over the child has already ended—under the guise of "modifying" the previous order.  Any other ruling would expand the family court's power

18

beyond its statutory grant.  Once the juvenile court's jurisdiction has ended, although the family court can enforce the Exit Order, the family court must rely on its own statutory authority to issue new orders, including orders modifying exit orders issued by the juvenile court.

In this case, mother completed the drug testing requirements imposed by the juvenile court's Exit Order, which only required completion of a "drug abuse treatment program with random testing."  Yet the family court's subsequent Custody Order created new drug testing requirements not tied to any drug abuse treatment program, contrary to father's assertion that the Custody Order merely "refined" or "adjusted" the drug testing requirements imposed by the Exit Order.

This case is a clear example of the boundary between the juvenile court's authority and the family court's authority.  Thus, before ordering mother to submit to new drug testing, the family court had to comply with the requirements in Family Code section 3041.5.  We discuss in the following sections whether the family court, in fact, did so.

**B.      *The family court properly made the judicial determination required by Family Code section 3041.5.***

Family Code section 3041.5 provides the following:  "[T]he court may order any person who is seeking custody of, or visitation with, a child who is the subject of the proceeding to undergo testing for the illegal use of controlled substances and the use of alcohol if there is a judicial determination based upon a preponderance of evidence that there is the habitual, frequent, or continual illegal use of controlled substances or the habitual or continual abuse of alcohol by the parent . . . .  This evidence may include, but may not be limited to, a conviction within the last five years for the illegal use or possession of a controlled substance."

Mother argues that the family court failed to make any judicial determination that mother exhibited the habitual, frequent, or continual illegal use of controlled substances or the habitual or continual abuse of alcohol as required by Family Code section 3041.5.  We disagree.

At the hearing, discussing first the incident on November 5, 2012, the family

court found that mother had a drug and alcohol problem that caused her arrest. Next, relying on the opinion of Dr. Genen, the family court found that mother had an addiction to, and a pattern of abusing, prescription drugs. Finally, before ordering mother to submit to drug testing, the family court expressly found a "continuing concern about the petitioner's risk of relapse unless she is under continued strict controls with respect to drug and alcohol abuse."

The foregoing findings by the family court constitute a "judicial determination based upon a preponderance of evidence that there is the habitual, frequent, or continual illegal use of controlled substances or the habitual or continual abuse of alcohol by the parent" pursuant to Family Code section 3041.5.

Further, mother alleges that Family Code section 3041.5 limits the family court to considering only evidence of a party's drug use and alcohol abuse occurring *after* a party's request to modify an exit order, and that therefore the family court erred in making the judicial determination that she exhibited "habitual, frequent, or continual illegal use of controlled substances" or "habitual or continual abuse of alcohol." (Fam. Code, § 3041.5.) She contends that Family Code section 3041.5 limits the family court to consider only evidence that "at the time of the hearing" or "at the time its order was made" she was under the influence of controlled substances or of alcohol. (Boldface omitted.)

The statute contains no such temporal limitation on the evidence that the family court can consider; indeed, such a limitation is nonsensical. There may be very little time that passes between the party's request to modify the exit order and the family court's ruling on that request. In many cases, the evidence showing the parent's illegal use of controlled substances or abuse of alcohol concerns events that occurred before or during the dependency proceeding. A habitual, frequent, or continual user of controlled substances or of alcohol would almost always avoid application of this statute if it limited the family court to such a narrow time window as proposed by mother.

Contrary to mother's assertion, a party's request to modify an exit order does not create a blank slate; the court will not put blinders on and ignore the party's history.

20

There is no bright line that distinguishes when a habitual, frequent, or continual abuser of controlled substances or alcohol is no longer one. Common sense dictates that the family court look to the totality of the circumstances to ascertain whether the risk of relapse in a particular case requires close scrutiny of a party.

Importantly, the statute even expressly authorizes the family court to consider "a conviction within the last five years for the illegal use or possession of a controlled substance." (Fam. Code, § 3041.5.) Thus, the Legislature undoubtedly contemplated a retrospective approach to this determination.

Citing no authority to support her position, mother appears to be relying on a forced reading of the "significant change of circumstances" standard in Welfare and Institutions Code section 302, subdivision (d), which requires a showing of a significant change of circumstances since issuance of the exit order as a precondition to the family court modifying that exit order. But that code section requires that, in determining whether circumstances have significantly changed, the family court must consider the events after the juvenile court issued its exit order, not after the party's request to modify the exit order. (Welf. & Inst. Code, § 302, subd. (d).) Moreover, that code section contains no blanket prohibition precluding the family court from considering evidence before or during the dependency proceeding. In fact, the very task of the family court is to consider the events that occurred before the exit order in order to identify what concerns about the requesting party the juvenile court identified in the exit order; this is the only means by which the family court can determine whether the requesting party has successfully addressed those concerns.

Thus, we reject mother's contention that the family court must consider only evidence after a party's request to modify an exit order in order to determine whether there is habitual, frequent, or continual illegal use of controlled substances or habitual or continual abuse of alcohol by the party as required by Family Code section 3041.5.

Here, the police arrested mother for child endangerment because she was under the influence of controlled substances and of alcohol in a public park; mother admitted that she had consumed controlled substances and alcohol earlier that day. Further,

21

evidence from Dr. Genen showed that mother was "doctor shopping" and that she was ingesting at least nine prescription medications as recently as the end of 2013. Both her arrest and her doctor shopping occurred only one to two years prior to the issuance of the Custody Order. Therefore, the family court did not err in finding "the habitual, frequent, or continual illegal use of controlled substances or the habitual or continual abuse of alcohol" by mother that warranted additional drug and alcohol testing as a condition for increased visitation.

### C. The family court has the authority to order drug testing to continue indefinitely as a condition to further visitation.

Mother contends that because Family Code section 3041.5 does not expressly state that the family court can order drug testing to continue "indefinitely," the family court erred in ordering mother to submit to open-ended drug testing as a condition to the new visitation schedule. For the following reasons, we reject her argument.

A court's "fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.] We begin by examining the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs." (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)

The plain language of Family Code section 3041.5 permits the family court to "order any person who is seeking custody of, or visitation with, a child who is the subject of the proceeding to undergo testing for the illegal use of controlled substances and the use of alcohol . . . ." The language is unambiguous. Nothing in the statute limits the family court to ordering drug testing for a fixed period of time. In contrast, other statutory provisions of the Family Code contain temporal limitations on the family court's authority; for example, Family Code section 3190, subdivision (a) imposes a one-year limitation when the family court orders a parent to participate in outpatient counseling with a licensed mental health professional. (See, e.g., *In re Chantal S.*, *supra*, 13 Cal.4th at p. 205.) Thus, if the Legislature had wanted to impose a temporal limitation

on the authority granted to the family court by Family Code section 3041.5 to order drug and alcohol testing, it would have.

Certainly, the Legislature had procedural safeguards in mind when it implemented this statutory provision, as it included requirements that the court order the least intrusive method of testing, that confidentiality of the test results be maintained by imposing civil sanctions for any breach of confidentiality, and that testing be conformed to specific federal standards. (*Deborah M. v. Superior Court* (2005) 128 Cal.App.4th 1181, 1189–1191.) Yet the Legislature imposed no temporal limitations on when any drug testing requirement must end. Again, if the Legislature had wanted to include such a temporal limitation in this section, it could have; clearly, it did not.

The plain and unambiguous meaning of the statute binds us; we "'will not read into the statute a limitation that is not there.'" (*People v. Oakley* (2013) 216 Cal.App.4th 1241, 1246; see *Utility Consumers' Action Network v. Public Utilities Com.* (2004) 120 Cal.App.4th 644, 658 ["Words that are not there should not be read into a statute"].) Accordingly, we hold that Family Code section 3041.5 grants the family court sufficient power to authorize open-ended drug testing as a condition to further visitation or custody. Of course, the family court can subsequently modify any order for "indefinite" drug testing based on a change of circumstances.

**D.** ***The family court has the authority to order that a positive drug test result would immediately trigger a reduced visitation schedule.***

Mother contends that the family court's condition that a positive drug test result would immediately trigger a return to the reduced visitation schedule set forth in the Exit Order violated Family Code section 3041.5. We find no merit in this argument.

Family Code section 3041.5 provides the following: "The parent . . . who has undergone drug testing shall have the right to a hearing, if requested, to challenge a positive test result. A positive test result, even if challenged and upheld, shall not, by itself, constitute grounds for an adverse custody or guardianship decision." The statute only precludes adverse action on a "custody or guardianship decision" as the

23

consequence of a positive test result.  In this case, the Custody Order specifies that a positive test result would affect the *visitation* schedule—nothing else.

"When one part of a statute contains a term or provision, the omission of that term or provision from another part of the statute indicates the Legislature intended to convey a different meaning."  (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 73.)  Elsewhere, Family Code section 3041.5 distinguishes between an order determining custody and an order determining visitation.  For example, the first sentence of the statutory provision explains that "the court may order any person who is seeking custody of, or visitation with, a child . . . to undergo testing for the illegal use of controlled substances and the use of alcohol."  And, the penultimate sentence of the statutory provision mandates that use of the results from the drug and alcohol testing is only for the purpose of assisting the court in determining "the content of the order or judgment determining custody or visitation."  Thus, the Legislature knows the difference between the two types of orders and chose to provide an extra shield insulating custody and guardianship decisions from frequent changes.

This is not a semantic distinction.  A change in custody is not equivalent to a change in visitation, due to the weighty interest in protecting stable custody arrangements for a child.  An alteration in a visitation schedule is less likely to cause a disruption in established patterns of care and emotional bonds with the primary caretaker or destabilize the sole physical custody arrangement, particularly in this case where the effect is a reduction in the visitation schedule of the noncustodial parent, not a loss of all visitation.  Therefore, we apply the plain and unambiguous language of the statute as written:  a family court can order that a positive result from a drug test will trigger a change in the *visitation* schedule.  (See *In re Miller* (1947) 31 Cal.2d 191, 199 ["Words may not be inserted in a statute under the guise of interpretation"].)

Mother also argues that the Custody Order deprived her of the statutory right to a hearing to challenge a positive rest result.  Family Code section 3041.5 expressly grants a party the right to such a hearing, if requested.  "'[W]e apply the general rule "that a trial court is presumed to have been aware of and followed the applicable law."'"  (*In re*

24

*Julian R.* (2009) 47 Cal.4th 487, 499; *People v. Montano* (1992) 6 Cal.App.4th 118, 122.) We interpret the family court's order in the context of the applicable statute, which we presume the family court was fully aware of and followed. Based on the record, it appears reasonable to conclude that the family court had no intention to abrogate the statute. The reasonable interpretation of the Custody Order is that the reduction in visitation would follow only a final determination on the validity of a positive test result, including a hearing if requested by a party. Thus, nothing in the Custody Order precludes mother from seeking a hearing to challenge a positive test result.

## DISPOSITION

The order is affirmed. Costs are awarded to David H.

CERTIFIED FOR PUBLICATION.

JOHNSON, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.