Filed 1/11/23  In re L.C. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re L.C., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>C.V.,<br><br>     Defendant and Appellant. | G061739<br><br>(Super. Ct. Nos. 21DP0532, 21DP0532A)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Vibhav Mittal, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*          \*          \*

Following a hearing under Welfare and Institutions Code section 364,[1] the juvenile court terminated jurisdiction over minor L.C. and issued an order granting her mother (Mother) sole legal and physical custody.  L.C.'s father (Father) was granted supervised visitation of six hours per week.  On appeal, Father argues the court erred by denying him joint custody and ordering monitored visitation.  We find the court did not abuse its discretion given Father's history of conflict with Mother and his failure to engage in court-ordered services.  As such, we affirm the court's order.


I

FACTS AND PROCEDURAL HISTORY

Most of the facts in this section are taken from our prior unpublished opinion in this matter, *In re. L.C.* (July 29, 2022, G061119) [nonpub. opn.].


*A. Petition and Initial Hearing*

Initially, "Father and [Mother] shared physical custody of L.C. under a child custody order.  Mother had primary physical custody of L.C., while Father had custody on Tuesdays and Wednesdays.  On April 6, 2021, when L.C. was two years old, it was reported to [Orange County Social Services (SSA)] that she had sustained multiple bruises and scratches.  Several other bruises were observed on her throughout April 2021.  Both parents blamed the other for these injuries.

"On May 14, 2021, SSA filed a juvenile dependency non-detain petition, which alleged jurisdiction over L.C. was proper under section 300, subdivision (b)(1).  Among other things, the petition alleged (1) L.C. may have been physically abused while in the care of Mother and/or Father, (2) both parents denied engaging in physical abuse,

---

[1]  All further undesignated references are to the Welfare and Institutions Code.

and (3) L.C. was suffering or at risk of suffering serious emotional damage in the care of Mother and/or Father.

"After the initial hearing on May 21, 2021, the juvenile court kept L.C. in her parents' custody but ordered them not to use any corporal punishments, to cooperate with SSA, and to cooperate with all referrals and services provided by SSA." (*In re L.C.*, *supra*, G061119.)

B. *Reports Prior to the Jurisdiction Hearing*

"Throughout this period, SSA had difficulty obtaining Father's cooperation. Its first report, dated July 1, 2021, shows SSA called Father on June 1 to schedule an in-person interview. Father declined to meet in person, stating he does not like to drive far, and requested to meet virtually on June 3 at 10:00 a.m. SSA sent Father a link for the virtual meeting, but he failed to join the meeting. Father was also 'hesitant with services.' He failed to complete his live scan requirement by SSA's first report. And though he claimed to have completed some sessions of a parenting program, he was unable to provide any confirmation of completion.

"Father was also uncooperative in allowing SSA to visit him and L.C. inside his home. He insisted on making video/audio recordings of SSA's in-home visits (apparently through security cameras). Such recordings violate SSA policy, so social workers were unable to enter Father's home. As such, most of the visits between SSA and Father were conducted outdoors. The inability of SSA to inspect Father's home created safety issues for L.C. Father worked as a security guard and had a firearm at home. Though he claimed the weapon was kept in a lock box, SSA was unable to confirm it was safely stored.

"SSA's next report, dated August 16, 2021, noted continuing difficulties with Father. He still had not completed live scan. Though he reported participation in a personal empowerment program, he provided no verification. Father continued to deny

3

social workers entry to his home unless they agreed to be recorded, so many meetings between SSA and Father occurred outdoors.  During one visit, SSA met Father in the parking lot of a local high school.  Father attempted to record the meeting on his phone and had to be instructed to stop.  SSA was finally able to conduct an in-home visit with Father in August 2021, in which it observed that his firearm was stored in a black lock box in a closet out of L.C.'s reach.

"Father also exhibited issues coparenting with Mother.  For example, Mother alleged that during one exchange of L.C., Father arrived an hour late, provided no explanation for his tardiness, handed L.C. to her, and told L.C., "'[Mother's] going to kill you.'"[2]  Due to the continuing conflict between the parents, the juvenile court ordered SSA to supervise all exchanges of L.C. between Mother and Father.

"SSA's reports following this order note several concerns with Father's conduct during supervised exchanges.  He routinely arrived late.  He also refused to get out of his car to facilitate the exchange of L.C. with Mother.  Rather, he would pass L.C. to Mother through the driver side window of the car during drop offs.  Likewise, during pickups, he would take L.C. from Mother through the same window.  This behavior concerned SSA, since L.C. could potentially fall out of the window during hand offs.  But Father ignored social workers when they advised him to exchange L.C. with Mother in a safer manner.

"During one SSA-supervised exchange in September 2021, Father arrived 15 minutes late to drop off L.C.  The social worker approached his car and asked Father if he had told Mother of his arrival.  But Father ignored the social worker and set up his phone to record.  L.C. was in the passenger seat standing on the lap of an unidentified

---

[2]  "Father claimed he said that '[M]other would "carry"' her as he handed L.C. to Mother. But when SSA asked Mother whether she may have misheard 'kill' instead of 'carry,' she was sure he had said 'kill' due to his body language and facial expressions." (*In re. L.C.*, *supra*, G061119.)

female.  The passenger window was rolled down and '[L.C.] was trying to climb out of the window.'  The social worker asked the passenger to hold L.C. to ensure she did not fall through the window.  The passenger did not respond.  The social worker then asked the passenger for her name.  She did not respond, and Father motioned her to be quiet.  Father also appeared to get upset.  He got out of the car, started walking on the sidewalk, and began mimicking the social worker, saying '"what's your name, what's your name?"'  Father later testified at a hearing that the female passenger was his girlfriend.

"Social workers also began examining L.C.'s body for new bruises and marks following exchanges.  Several of these examinations uncovered new bruises and marks after L.C. returned from Father's care.  But SSA was unable to substantiate any physical abuse.  When Father was asked about the bruises by SSA, he either failed to reply or stated they were accidentally sustained while playing.  Though Mother blamed Father for some of the injuries, she acknowledged L.C. was very active and sometimes sustained accidental bruises.  Doctors 'concluded that the injuries caused matched the parent's story in some instances, but [they had] concerns as to the young age of the child and the amount of bruising to the child.'"  (*In re. L.C.*, *supra*, G061119.)

*C. The Jurisdiction/Disposition Hearing*

"A combined jurisdiction and disposition hearing commenced in October 2021 (the jurisdiction hearing).

"Generally, Mother had been cooperative with SSA throughout the process.  By the time of the hearing, she had completed a personal empowerment program, a parenting program, and was engaged in counseling and in-home support services as well as random drug testing.

"In contrast, SSA expressed concerns about Father at the hearing.  Though he had completed a parenting class, SSA was unable to confirm he had actually

5

participated or learned anything because he failed to provide consents allowing SSA to speak with his therapist.

"Father had also been uncooperative with multiple social workers. He continued to record social workers after being told it was against SSA policy. He also routinely failed to make himself available for home assessments. For example, he refused to answer his door for unannounced visits even though social workers saw him looking at them through the window. Due to Father's continual failure to allow access to his home, SSA was unable to verify that the home was safe for L.C. This was especially important given SSA's knowledge that Father 'own[ed] some weapons.' L.C. also continued to return from Father's care with unexplained injuries. Still, SSA was unsure that removal was appropriate since none of the abuse allegations against Father had been substantiated.

"Father denied needing any services to improve his parenting. He also explained that he had told his girlfriend not to identify herself to the social worker because 'legally she doesn't have to identify herself.' However, Father divulged that his girlfriend had been present at his visits with L.C. and that the girlfriend had been alone with L.C. He was also aware that Mother had alleged his girlfriend had hit L.C.

"The juvenile court issued its ruling on October 15, 2021 (the October 15 ruling). It sustained the majority of the allegations in SSA's petition. L.C. was declared a dependent of the juvenile court, but she was allowed to remain in the custody of her Mother and Father as they engaged in family maintenance services. Though SSA had not recommended that L.C. be removed from Father's care, the court stated it was 'a very close call' as to whether removal was appropriate. '[H]is actions to date very possibly put [L.C.] at a substantial danger of physical health, safety, protection, physical or emotional well-being.'

"The juvenile court issued several orders to address Father's behavior, including to (1) cease all recording of visitation or exchanges or of any component of the

6

dependency matter; (2) comply in providing access to his home for unannounced and announced visits by SSA; (3) participate in anger management and sign appropriate releases; and (4) secure and keep safe all weapons in his home. Likewise, the court ordered SSA to 'conduct home checks to confirm all weapons are safe and secure.'" (*In re. L.C.*, *supra*, G061119.)

*D. The Section 387 Petition and Detention Hearing*

"On November 12, 2021, SSA filed a petition under section 387 (the 387 petition) to modify the October 15 ruling and remove L.C. from Father's custody. The 387 petition alleged Father had failed to comply with the orders listed in the October 15 ruling. Among other things, it alleged that '[o]n November 10, 2021, the [F]ather was observed recording the exchange of the child. When confronted, the [F]ather denied the existence of the courts [*sic*] order. Further, from October 15 to November 10, 2021, the [F]ather prevented SSA from inspecting his home and/or observing visitation with the child on two occasions.'

"Prior to the initial hearing on the 387 petition, SSA filed a report summarizing its recommendation that L.C. be detained from Father. It stated that on October 27, 2021, SSA informed Father that a home assessment and visit observation would be conducted following the parental exchange of L.C. on Tuesday, November 2. The day of the assessment, though, Father claimed he was unavailable because he had been called into work. The social worker cooperated and rescheduled for November 9. Father thanked her for understanding. But on November 9, Father 'declined [the assessment] and stated that he and [L.C.] were going to the zoo. [Father] indicated that he never agreed to meet.'

"During the exchange of L.C. from Father to Mother on November 10, the social worker observed Father using a dash cam in violation of the October 15 ruling. When the social worker asked if he was recording, Father got 'within inches' from her

7

face and started asking '"why" with a raised voice, in what appeared to be an effort to . . . intimidat[e].' When the social worker stated he was violating a court order, Father said '"what court order" then [told her] to back up.' SSA inspected L.C. following that exchange and discovered new bruises on her ribs. When SSA asked Father about the injuries, he requested a photo. But he failed to respond after being sent a picture of the bruises.

"At an initial hearing on the 387 petition on November 16, 2021, it was also revealed that Father had not yet begun anger management classes. Following the hearing, the juvenile court ordered L.C. to be detained from Father and granted him six hours of weekly supervised visitation. It scheduled an adjudication hearing on the 387 petition for January 20, 2022." (*In re. L.C.*, *supra*, G061119.)


*E. The Adjudication and Disposition Hearings and Initial Appeal*

"Between the detention hearing and the adjudication hearing, SSA contacted Father numerous times to schedule a meeting to discuss the allegations in the 387 petition. Father resisted any attempts to meet. Rather, he insisted that prior to any meetings, SSA had to agree to respect his 'constitutional[ly] protected rights.' But he failed to identify any specific rights. SSA offered to email him a copy of the 387 petition for him to review and respond. Father refused to provide an email address and demanded that SSA send him the allegations from the 387 petition through text message, which SSA did. In response, Father claimed SSA had made false reports, provided false testimony, and had violated their own policies, the Constitution, and federal and state law.

"No visitation occurred between L.C. and Father during this period. A social worker contacted him multiple times to coordinate monitored visitation with L.C. But Father accused the social worker of lying and making false reports and blamed SSA for his lack of contact with L.C. He demanded an apology from SSA before commencing

8

any visitation with L.C.  Father also failed to attend counseling or participate in any anger management classes.

"Father did not attend the adjudication hearing on January 20, 2022.  While he instructed his attorney to request a continuance, he repeatedly failed to provide his attorney with any grounds to justify this request.  The juvenile court denied the continuance and sustained the 387 petition.

"A disposition hearing on the sustained 387 petition was held on February 10, 2022.  SSA made no progress with Father between the adjudication and disposition hearings.  Similarly, no visitation occurred between Father and L.C. during this period.  At the disposition hearing, the court removed L.C. from Father's custody."  (*In re. L.C.*, *supra*, G061119, fn.omitted.)

Father appealed, arguing there was insufficient evidence to support the juvenile court's order sustaining the 387 petition.  We disagreed and affirmed the order in a prior opinion.  (*In re. L.C.*, *supra*, G061119.)

*F. The Section 364 Report*

Following Father's initial appeal, a hearing under section 364 occurred on August 19, 2022.[3]  SSA issued a report prior to that hearing, which found L.C. was doing well in Mother's care.  Mother had also complied with her case plan services and goals.

As for Father, SSA "was unable to assess [his] current family circumstances.  [He] did not make himself available during th[e] reporting period."  Father had been ordered to engage in services for anger management, counseling, and parenting education.  While SSA attempted to schedule an appointment with Father to

---

[3]  "Section 364 establishes procedures for review hearings for children who have been adjudged dependent children, but have not been removed from their parents.  When proceeding under section 364, because the child is in placement with a parent, the court is not concerned with reunification, but with determining whether continued supervision is necessary in the family home."  (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 650.)

discuss his services, he did not respond to these attempts. SSA also mailed and e-mailed Father the case plan with resources so he could enroll in services himself. But Father failed to provide any proof of participation or completion.

Though Father had been approved for six hours a week of monitored visits with L.C., no visitation occurred during this period. Father contacted the social worker on June 16, 2022, requesting to have telephonic or FaceTime visits with L.C. A schedule was eventually worked out between Mother, Father, and the social worker that would monitor the calls. But on July 14, the social worker reported that she had been unable to reach Father to resume visitation, as he had not returned any of her voice messages. Rather, Father insisted on communicating via text message even after being instructed by the social worker to contact her telephonically to discuss visitation rules. Due to these issues, prior to August 19, 2022 hearing, Father's last visit with L.C. had been in November 2021. It is unclear from the record whether L.C. has seen Father since the hearing.

The only witness at the August 19, 2022 hearing was the case social worker. She recommended that Mother be granted sole legal and physical custody of L.C. and that Father be awarded monitored visitation. The social worker did not believe joint custody or unmonitored visitation was appropriate given Father's failure to comply with the ordered services. He had not attended anger management classes, counseling, or parenting classes.

Following the hearing, the court found judicial supervision of L.C. was no longer necessary. It granted Mother sole legal and physical custody because L.C. was "in a stable setting with Mother. Joint physical or joint legal custody would likely add conflict to [L.C.'s] life, the type of conflict that resulted in the initial dependency case. The court also ha[d] concerns about joint physical or joint legal custody, because Father ha[d] not engaged in the services that the court ordered." The court awarded Father six hours of supervised visitation per week to be arranged by Father and Mother. The

10

monitor could either be a neutral party agreed upon by both parents or a professional monitor paid by Father.

Father appeals this order. He contends the court erred by denying him joint custody and by ordering supervised visitation.

## II

## DISCUSSION

"When terminating its jurisdiction over a child who has been declared a dependent child of the court, section 362.4 authorizes the juvenile court to issue a custody and visitation order (commonly referred to as an 'exit order') that will become part of the relevant family law file and remain in effect in the family law action 'until modified or terminated by a subsequent order.' When making a custody determination under section 362.4, 'the court's focus and primary consideration must always be the best interests of the child.'" (*In re T.S.* (2020) 52 Cal.App.5th 503, 513, fn. omitted.)

Custody and visitation orders are reviewed for an abuse of discretion. (*Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1162-1163.) "An abuse of discretion occurs when the trial court exceeds the bounds of reason; even if we disagree with the trial court's determination, we uphold the determination so long as it is reasonable. [Citation.] We do not reverse unless a trial court's determination is arbitrary, capricious, or patently absurd." (*Id.* at p. 1163.) Based on the record, we conclude the court acted within its discretion.

As to the custody order, Father makes a conclusory assertion that "[i]t would be in [L.C.'s] best interest for her father to know if she had any major development with her health or education so the visits could be arranged around [L.C.'s] needs." But Father fails to persuasively explain how this would be in L.C.'s best interests. Joint custody requires that parents cooperate with each other to coparent their child. (See *In re Marriage of McLoren* (1988) 202 Cal.App.3d 108, 114-116.) Father

11

has not shown any ability to cooperate with Mother.  Nor has he taken any steps to improve his ability to communicate with her, such as counseling or anger management.

Further, the record shows Father has consistently prioritized himself over L.C.  For example, he missed nearly a year of visitation with her because of his unwillingness to communicate with SSA and his insistence that SSA apologize to him. He also endangered L.C.'s safety in the past by insisting on passing her through the window of his car during parental exchanges, apparently due to his need for control. Nothing in the record shows Father has made any effort to address these concerns, as he has refused to engage with any of the ordered services.

The visitation order is reasonable for the same reasons.  Father argues that he has not abused L.C., and "[L.C.] would benefit from spending unmonitored time in a public setting with her father to build on their relationship."  But, again, Father's has not shown any attempt to address the issues that caused the juvenile court to exercise jurisdiction over L.C.  Also, nothing in the record shows that unmonitored visitation would be more beneficial for L.C. than monitored visitation.  Rather, at the time of the August 19, 2022 hearing, L.C. had not seen Father for nearly a year, a significant portion of her life given her young age.  Given these facts, it was not unreasonable for the court to order supervised visitation to ensure L.C.'s safety and well-being during her visits with Father.

Should Father be able to show a significant change of circumstances in the future, he may seek a modification of the juvenile court's order.  (See *In re Marriage of David & Martha M.* (2006) 140 Cal.App.4th 96, 101.)

## III

## DISPOSITION

The juvenile court's order is affirmed.

MOORE, ACTING P. J.

WE CONCUR:

GOETHALS, J.

MOTOIKE, J.