Filed 6/16/23 Marriage of Yim CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| In re Marriage of ILONA and MICHAEL YIM. | |
| ILONA YIM, <br><br> Appellant, <br><br> v. <br><br> MICHAEL YIM, <br><br> Respondent. | G061000 <br><br> (Super. Ct. No. 15D003338) <br><br> O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Carmen R. Luege, Judge. Affirmed.

Law Offices of Lisa R. McCall, Lisa R. McCall and Erica M. Baca for Appellant.

Michael Yim, in pro. per., for Respondent.

Ilona Yim appeals from the denial of her motion to renew a domestic violence restraining order (DVRO) issued against her ex-husband Michael Yim.[1]  She contends the trial court erred by taking judicial notice of the entire court file and by applying the wrong legal standard in four ways: (1) allowing Michael to challenge the evidence and findings underlying the issuance of the DVRO; (2) disregarding his abusive litigation tactics; (3) disregarding his violations of the DVRO; and (4) considering his state of mind in violating the DVRO.  We affirm the order.

FACTS

Ilona and Michael married in 2008, Ilona filed for divorce in 2015, and the marriage was dissolved in 2017.  They share a minor daughter (Daughter).

I.      *Michael's Abusive Conduct in 2015 and the Resulting Protective Orders*

In 2015, Michael had become addicted to prescription medication, and Ilona believed he was "under the influence of drugs consistently."  On March 24, Ilona came home and saw a hole in the wall.  Michael told Ilona he put it there.  When she asked him why, "[he] said he pondered over the last few days whether to put a hole in the wall with his fist or [her] face."

The next day, Ilona noticed a dent in her car.  When she asked about it, Michael said he put it there with his fist.

The day after, on March 26, Michael became angry at Ilona when she refused to talk to him and instead began putting Daughter, then age four, to bed.  He followed them to a bedroom, yelled at Ilona, and paced back and forth.  He "became so angry that he violently threw a dresser down on the ground and stomped on a framed picture on the floor."  He blocked Ilona from leaving the room with Daughter.  In response to Ilona's call, the police arrived at the home, conducted interviews, and found

_____

1      For clarity, we refer to the parties by their first names.

bags in the living room, which were "unsecured" and contained a rifle, a revolver, and ammunition. Michael was arrested for child endangerment (Pen. Code, § 273a);[2] making criminal threats (§ 422); and false imprisonment (§ 236). They also later found "18 guns and over 8,000 rounds of ammunition."

Three protective orders were issued against Michael: (1) An emergency protective order (EPO) on March 27, 2015; (2) a workplace temporary restraining order; and (3) a CLETS domestic violence criminal protective order (CPO) on June 19, 2015 in a related criminal action. Despite the EPO prohibiting him from contacting Ilona or Daughter through any means, Michael called Ilona several times from jail.

II.   *Michael's Guilty Plea and the Second CPO (2016)*

On March 14, 2016, in the related criminal action, Michael pleaded guilty to one count of vandalism (§ 594, subd. (a)/(b)(2)(a)) and two counts of disobeying a domestic relations court order (§ 273.6, subd. (a)). As the factual basis for the plea, Michael admitted to "[w]illfully, unlawfully, and maliciously damag[ing] and destroy[ing] property" at the residence, and to "knowingly and [i]ntentionally" violating the EPO by contacting Ilona twice. All other charges were dismissed. That same day, a second CPO was issued against Michael protecting Ilona and Daughter, as a probation condition order (§ 1203.097).

III.  *The Original DVRO (2016)*

Days after the second CPO was issued, Ilona requested a DVRO. She identified the most recent dates of abuse as the 2015 events when Michael put a hole in the wall, dented her car, blocked her from leaving the house, and threw the dresser down.

Ilona described other earlier acts of abuse, including: (1) Michael leaving her and Daughter, then six months old, at a restaurant when Ilona refused to ride home

---

2        All further statutory references are to the Penal Code unless otherwise indicated.

3

with him drunk; (2) him kicking Daughter's toys in front of her; (3) him slamming the dishwasher door, causing dishes inside to break, during an argument; (4) him slamming Ilona's laptop down on a table; (5) using profanity often in front of Daughter; and (6) telling Ilona many times, "I want to take myself out," and once telling Daughter, "[H]ow about daddy just shoots himself?"

On May 13, 2016, the trial court (Judge Michael J. Naughton) heard testimony from both parties on the DVRO request.[3] By party stipulation, the police report of the March 26, 2015 incident was admitted into evidence. In the report, the officer noted that Michael had violated the EPO by calling Ilona seven times from jail.

The trial court found by a preponderance of the evidence that Michael committed acts of domestic violence against Illona and Daughter. The minute order noted that Michael "violat[ing] the Criminal Protective Order seven times is enough for this court to issue a restraining order."[4] The court ordered sole legal custody to Ilona, who was "willing to allow monitored visits" between Michael and Daughter. It issued a five-year DVRO to protect Ilona and Daughter and ordered him to complete a 52-week batterers' intervention program.

From May 2016 to February 2020, the DVRO was amended five times to change, among other things, Michael's visitation schedule with Daughter. Michael sought, unsuccessfully, to have Daughter removed from the DVRO as a protected party; he never asked for Ilona to be removed.

---

[3]    A transcript of the hearing is not included in the record on appeal.

[4]    Although the trial court referred to seven violations of a CPO, it most likely was referring to the seven calls Michael attempted on March 27, 2015, in violation of the EPO. Those calls could not have been in violation of any CPO, the first of which was not issued until months later.

IV.    *The Request for Renewal of the DVRO (2021)*

Before the DVRO was set to expire on May 12, 2021, Ilona filed a request for lifetime renewal, or alternatively, for a five-year renewal. In her supporting declaration, Ilona declared Michael regularly violated the DVRO, including (1) a 2017 incident when Michael picked up Daughter at German school without a visitation monitor present; (2) a 2019 incident when Michael approached Ilona during a school recital; (3) occasions when Michael would send text messages to Daughter; and (4) an occasion when Michael asked his adult son to text Ilona on his behalf. In his opposition, Michael denied that these events constituted violations of the DVRO.

At the four-day hearing, the trial court (Judge Carmen R. Luege) heard testimony from Ilona, Michael, and his treating psychiatrist. To save time, the court informed the parties it was treating the underlying facts that led to the issuance of the original DVRO as "credible" and "having been proven." It stated it was taking judicial notice of the entire court file, so the parties needed only to "refer to all the documents without having to ask" for judicial notice.

After taking the matter under submission, the trial court denied the request to renew the DVRO (the Denial Order). The court addressed the four significant events that Ilona alleged to be violations of the DVRO and found she "failed to produce credible and persuasive evidence Michael's conduct between 2017 and the time of hearing constituted DVRO violations."

With respect to the 2017 German school pickup, the main facts are not in dispute. About 8:15 a.m. one Saturday, Ilona texted Michael through TalkingParents, a communication program, asking him to "please pick [Daughter up at German school that day] and let me know if it doesn't work out." Michael saw the message around 11 a.m. and responded three minutes later to inform Ilona that he did not know if his visitation monitor would be able to make it. He added, "Since I do not know when she will, please

5

pick her up. I will also go there alone just in case you do not get this message. I will be 100 years [*sic*] away." Ilona did not view the message until two days later. When asked why she did not turn on the message alert feature on TalkingParents, Ilona testified, "Because I don't want to be available at whims [*sic*] notice. I want to decide when I read the messages, and I get e-mail notifications every time a message is sent by Michael." Once Michael picked up Daughter, he had her call Ilona to let her know. Ilona had Michael drop Daughter off at her home and called the police to report the violation. Michael waited in his car for about 15 minutes before driving away. The court found Michael's reason for picking up Daughter without a monitor "more credible and persuasive than Ilona's presentation of the facts." It found his 15-minute wait outside the house not a DVRO violation "because he did not want to appear like he had avoided the police by leaving the property immediately after delivering [Daughter] to [Ilona's] home."

As for the 2019 school recital, the trial court amended the DVRO to allow Michael to attend, provided he "maintain a reasonable distance from [Ilona] and is not to interact with her at the recital." But immediately after the recital, Michael approached Ilona and proposed he start his visitation with Daughter immediately, rather than wait four more hours for the regularly scheduled custodial exchange. The court found that the contact was "peaceful" and Ilona's description of it was "an exaggerated effort" to establish a DVRO violation. The court noted that although Ilona described the conversation as "unwanted," "bothersome," and "unpleasant," she testified that it did not cause her fear.

The trial court found Ilona had "engaged in multiple instances of exaggerated testimony about particular incidents leading the [c]ourt to conclude that [Ilona] lacks credibility."

6

The court found that Michael's efforts to have his adult son contact Ilona—the son was asking her to check her TalkingParents messages—were appropriate because they concerned "an urgent custody-related timing issue." It did not find any DVRO violation resulting from Michael's communications with Daughter. The court did not believe the nature of either communications would cause Ilona to have "genuine and reasonable" apprehension of further abuse. The court rejected Ilona's claim that Michael was stalking her while she and Daughter were on a six-week trip in Germany, by asking Daughter for their address to serve Ilona court papers there.

Although it found no DVRO violations, the trial continued to analyze factors to determine whether Ilona had reasonable apprehension of future abuse if the DVRO were not renewed and whether her apprehension was genuine and reasonable. Ultimately, the court found that Ilona failed to establish these facts by a preponderance of the evidence and denied the renewal request.

DISCUSSION

Ilona contends the trial court wrongly took judicial notice of the entire underlying court file. She also contends it applied the wrong legal standard by (1) allowing Michael to challenge the evidence and findings underlying the issuance of the DVRO; (2) disregarding his abusive litigation tactics; (3) disregarding his violations of the DVRO; and (4) considering his state of mind in violating the DVRO. For all but the third contention, we disagree that the trial court erred. As for the alleged DVRO violations, we agree with Ilona that Michael violated the DVRO, but we nonetheless affirm because Ilona fails to show the errors resulted in a miscarriage of justice.

I.      *Standard of Review*

We review a denial of a request to renew a DVRO for abuse of discretion. (*Ashby v. Ashby* (2021) 68 Cal.App.5th 491, 509 (*Ashby*).) We review claimed evidentiary errors under the same standard. (*In re Marriage of F.M. & M.M.* (2021)

7

65 Cal.App.5th 106, 116.) "An abuse of discretion occurs when the trial court exceeds the bounds of reason," that is, when its ruling "is arbitrary, capricious, or patently absurd." (*Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1163.) But when deciding the legal question of "'"'whether a trial court applied the correct legal standard to an issue in exercising its discretion,'"'" we apply a de novo review. (*Ashby*, at p. 509.) We presume the trial court order is correct, "'and all intendments and presumptions are indulged to support it on matters as to which the record is silent.'" (*Ibid.*) The appellant bears the "'burden to affirmatively demonstrate error.'" (*Ibid.*)

Even when error is shown, "we will not substitute our opinion and divest the trial court of its discretionary power unless [the appellant] shows a clear case of abuse *and a miscarriage of justice*." (*In re Marriage of Brewster & Clevenger* (2020) 45 Cal.App.5th 481, 500 (*Marriage of Brewster*) [emphasis added]; Cal. Const., art. VI, § 13.) A miscarriage of justice occurs when "it is reasonably probable that the trial court would have reached a result more favorable to the appellant absent the error." (*Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986, 999; see also *In re S.G.* (2021) 71 Cal.App.5th 654, 673 ["lower court decision applying the incorrect legal standard" subject to miscarriage-of-justice limitation].)

II.    *Judicial Notice of the Court File*

Ilona argues the trial court improperly took judicial notice of the entire court file. Not so. First, a trial court can properly take judicial notice of state-court records (Evid. Code, § 452, subd. (d)), including the "entire trial court file" (see, e.g., *In re Marriage of Wilson & Bodine* (2012) 207 Cal.App.4th 768, 770, fn. 1 [taking judicial notice of "entire trial court file"]). Although judicial notice generally may not be taken of the truth of hearsay statements in those records (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 130, fn. 7), Ilona does not identify any time when the court erred in that way, and she therefore fails to show "how [the alleged error] affected the judgment."

8

(*Shuster v. BAC Home Loans Servicing, LP* (2012) 211 Cal.App.4th 505, 512, fn. 4.) Indeed, at the close of evidence, the trial court made clear it was no longer taking judicial notice of the entire record and that the parties were expected to submit written requests for judicial notice of records for the court to review. In any event, Ilona waived the argument by failing to object below. (*Shuster*, at p. 512, fn. 4.)

III.    *Legal Standard Applied*

Ilona next contends that the trial court failed to apply the correct legal standard. We reject this general contention. In the Denial Order, the trial court recited the following correct legal standard.

Family Code section 6345, subdivision (a), provides in relevant part, a DVRO "may be renewed upon the request of a party . . . **without a showing of further abuse since the issuance of the original order**." (Emphasis added.) Citing *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1283 (*Ritchie*) and *Ashby*, *supra*, 68 Cal.App.5th at pp. 509-510, the trial court acknowledged that it is "unnecessary for the protected party to introduce or the court to consider actual acts of abuse the restrained party committed after the original order went into effect." Instead, the court must determine "whether the protected party has ['a reasonable apprehension['] abuse will occur at some time in the future if the protective order is allowed to expire." (*Ashby*, at p. 510; *Ritchie*, at p. 1288.) "A trial court should renew the protective order, if, and only if, it finds by a preponderance of the evidence that the protected party entertains a 'reasonable apprehension' of future abuse. . . . [T]his does not mean the court must find it is more likely than not future abuse will occur if the protective order is not renewed. It only means the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension is **genuine and reasonable**." (*Ashby*, at p. 510; *Ritchie*, at p. 1290 [emphasis added by trial court].)

9

The trial court listed the five factors to consider in determining the genuineness and reasonableness of a party's apprehension: (1) the factual basis of the initial DVRO; (2) any significant changes in the circumstances surrounding the events justifying the DVRO; (3) whether the restrained and protected parties have moved on with their lives so that the opportunity and likelihood of future abuse has diminished; (4) whether changes in the parties' lives have enhanced the opportunity and possibility of future abuse; and (5) the burden of the protective order on the restrained party. (*Ritchie*, *supra*, 115 Cal.App.4th at pp. 1290-1292.) The court noted the fifth factor would not justify denying a DVRO renewal where there is reasonable apprehension of future acts of physical abuse.

Having recited more or less the same standard in her opening brief, Ilona fails to demonstrate the court applied the wrong legal standard.

IV.    *Alleged Evidentiary Errors*

Ilona's four examples of how the trial court applied the wrong legal standard are more accurately described as complaints of evidentiary error. In essence, she argues the trial court considered inadmissible evidence or evidence for an improper purpose (Michael's challenge to the evidence and findings underlying the issuance of the DVRO and his state of mind in violating the DVRO) and it refused to properly weigh relevant evidence (Michael's litigation tactics and violations of the DVRO). We address each complaint in turn.

A.    *The Evidence and Findings Underlying the Initial DVRO*

Ilona's first complaint is that the trial court impermissibly allowed Michael to "challenge the truth of the evidence and findings underlying the initial order." (*Ritchie*, *supra*, 115 Cal.App.4th at p. 1290.) Specifically, Michael explained that he punched a hole in the wall because he was upset over a work dispute, not because of Ilona, and that she saw the hole the day after it happened. He also testified that he "did

10

not throw the dresser down as [Ilona had] described." He instead claimed he pushed the dresser, caught it before it fell to the ground, and then decided to let it go, at which point it fell to the ground. We find no reversible error.

Assuming Michael's testimony should have been excluded, Ilona cannot show resulting prejudice. In the Denial Order, the trial court expressly "accept[ed] as proven facts [Michael's] conduct as described in [Ilona's] request for a restraining order filed on May 13, 2016" and "considered [Michael's] abusive conduct during the marriage."

B.    *Michael's Litigation Conduct*

To show Michael was harassing her, Ilona testified that every year on his birthday, he filed a request for order (RFO) to change the custodial arrangement without presenting new facts and that he did not appear at one of those hearings. Ilona contends the trial court erred by disregarding these harassing litigation tactics. We are unpersuaded.

Ilona correctly notes that "custody and financial disputes are often used by a restrained party as a pretext to continue harassing and controlling the protected party." (*Ashby*, *supra*, 68 Cal.App.5th at p. 516.) And a trial court can "find, where appropriate, that a party's litigation strategies and tactics are evidence of inappropriate behavior that provides grounds for a restraining order's renewal." (*Lister v. Bowen* (2013) 215 Cal.App.4th 319, 336.)

Here, the record suggests the trial court considered the allegation of Michael's inappropriate litigation tactics. Over his objection, the trial court allowed Ilona to testify about his repeated, unsuccessful RFO's. The court reasoned, "[I]f there was an RFO every year, and there was a ruling every year, then those two things need to be put together for me. [¶] And if it shows some pattern, then I will infer that -- I mean,

11

[Ilona's counsel] can argue what the pattern is based on the specific record." By finding no issue with Michael's litigation conduct, the court impliedly rejected Ilona's argument.

Ilona also complains the court improperly considered her testimony to find that her renewal request was motivated by custody considerations. She testified that the RFO's were "disruptive" and "harassing" and that it was "unfair" for Michael to ask for more time with Daughter. From this testimony the court inferred Ilona's main "fear" was that expiration of the DVRO would "lead to time-sharing modifications" in favor of Michael, "rather than [from] genuine apprehension about future abuse." This was a reasonable inference for the trial court to draw. This court "'has no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence. We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses. [Citation.] "Issues of fact and credibility are questions for the trial court." [Citations.] It is not an appellate court's function, in short, to redetermine the facts.'" (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.)

C. *The DVRO Violations*

Ilona argues the trial court erred by finding that none of the following six examples constituted DVRO violations: (1) Michael directed his adult son to text Ilona, despite the DVRO prohibiting him from contacting Ilona except through TalkingParents; (2) Michael approached Ilona at a school recital, despite the DVRO requiring that he "shall maintain a reasonable distance from [Ilona] and is not to interact with her at the recital;" (3) While Ilona and Daughter were vacationing in Germany, Michael asked Daughter to confirm Ilona's family home address there to serve her with an RFO, despite the DVRO prohibiting him from keeping them "under surveillance;" (4) Michael texted Daughter outside his custodial time; (5) Michael picked up Daughter from German school without a monitor, despite the requirement of monitored visits, and waited 15

12

minutes at Ilona's house after dropping off Daugther; and (6) Michael tried unsuccessfully to see Daughter at school before the monitor arrived, talked to someone there about using that time to tutor her, and left gifts for her there. While we agree that many of these actions were violations of the DVRO, we nonetheless conclude that Ilona fails to establish the trial court's erroneous ruling resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.)

Stated another way, we are satisfied the trial court would have reached the same result even if it had determined that Michael's conduct violated the DVRO. The trial court correctly recognized that a "violation of a DVRO can support a finding of reasonable apprehension." Still, the court expressly found that Michael's testimony was credible and that Ilona "engaged in multiple instances of exaggerated testimony about particular incidents leading the [c]ourt to conclude that [she] lacks credibility." In accepting Michael's version of events, the court essentially found that Michael's conduct was not the result of ill will toward Ilona, and it did not believe Ilona's claimed apprehension of abuse was genuine and reasonable. As the reviewing court, we do not second-guess the trial court's credibility determinations. (*Marriage of Brewster*, *supra*, 45 Cal.App.5th at p. 500.)

Having found no violations of the DVRO, the trial court still considered the *Ritchie* factors to determine whether Ilona had established "by a preponderance of the evidence that the protected party entertains a 'reasonable apprehension' of future abuse[, i.e., that] the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension is genuine and reasonable." (*Ashby*, *supra*, 68 Cal.App.5th at p. 510.) First, the trial court accepted as true the factual basis for the DVRO, but noted that Michael never hit, pushed, or grabbed Ilona. Second, the court found "significant changes in the circumstances surrounding the events justifying the initial 2016 DVRO." In 2016, Michael was not under the care of a

13

psychiatrist, was abusing prescription medication, and was unemployed and sleeping most of the day. The court credited the testimony of Michael's treating psychiatrist that Michael was taking medication that improved his psychiatric issues, was no longer abusing prescription medication, and was employed fulltime. Third, the court found that Michael "ha[d] moved on with his life so that the opportunity and likelihood of future abuse [wa]s diminished." He completed courses on anger management and coparenting skills, which "indicate[d] a recognition on [his] part that he caused the marital problems and that he has gained an understanding on how to manage his behavior towards [Ilona] to avoid confrontation." He maintained a strong relationship with Daughter. Finally, as stated *ante*, the court made a factual determination that Ilona was mainly concerned Michael would receive more time with Daughter if the DVRO were not renewed. While other judges may have reached the opposite result, we cannot say the evidence here compels it as a matter of law.

Ilona's reliance on *Lister v. Brown* (2013) 215 Cal.App.4th 319 does not change the analysis. The *Lister* court noted "that any violation of a restraining order is very serious[ ] and gives very significant support for renewal of a restraining order." (*Id.* at p. 335.) But the issue in *Lister* was whether a trial court's decision to *renew* a DVRO was supported by substantial evidence—not whether evidence of restraining-order violations compelled a determination that the DVRO must be renewed as a matter of law. (*Id.* at p. 322.)

We conclude it is not reasonably probable that Ilona would have obtained a more favorable outcome even if the trial court had found Michael violated the DVRO.

D.    *Michael's State of Mind*

Finally, Ilona contends the trial court may not consider whether Michael intended to violate the DVRO—it matters only that he did violate it. Ilona's cited authority, however, does not support her position. In *Rybolt v. Riley* (2018)

14

20 Cal.App.5th 864, 868, 871-872 (*Rybolt*), the restrained party generally denied intending to intimidate or harass the protected party, but the trial court found the restrained party had violated the DVRO several times and that circumstances had not sufficiently changed to reduce the need for continued protection. The appellate court affirmed the renewal of the DVRO, noting the trial court had properly considered the *Ritchie* factors. (*Id.* at pp. 873-875, 877.) *Rybolt* does not hold that a trial court is barred from considering the restrained party's state of mind when his or her actions violate a restraining order. To the contrary, a court can and should consider "whether the restrained and protected parties have moved on with their lives so far that the opportunity and likelihood of future abuse has diminished to the degree they no longer support a renewal of the order." (*Ritchie*, *supra*, 115 Cal.App.4th at p. 1291.) Inquiry into the restrained party's state of mind could certainly be relevant to that question.

## DISPOSITION

The order is affirmed. Respondent shall recover his costs on appeal.

DELANEY, J.

WE CONCUR:

MOORE, ACTING P. J.

SANCHEZ, J.

15