Filed 10/6/25  In re Cheyenne P. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| In re CHEYENNE P., et al., Persons Coming Under the Juvenile Court Law. | B344182 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 24LJJP00309A-B) |
| Plaintiff and Respondent, | |
| v. | |
| MELISSA P., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Donald A. Buddle, Judge.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica Buckelew, Deputy County Counsel for Plaintiff and Respondent.

———————————

Melissa P. (mother) appeals from juvenile court orders sustaining the allegations of a dependency petition, removing mother's children from her custody, and denying mother's request for unmonitored visitation. Mother contends the trial court erred by entering the challenged orders because by the time of the jurisdiction and disposition hearings, mother had fully alleviated the conditions that brought the family before the juvenile court, and the children were not at risk of harm. We find no error, and thus we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Investigation and detention.

Mother and Robert B. (father) are the parents of Cheyenne P. (born in November 2018) and Sierra P. (born in November 2019). Mother has a lengthy criminal history, including four convictions in 2019 and 2020 for possession of controlled substances, and a 2024 conviction for possession of a stolen vehicle. Father also has a lengthy criminal history, including for possession of controlled substances and spousal battery, and he was incarcerated when this case began. The family has been reported many times to the Los Angeles County Department of Children and Family Services (DCFS), including in 2018 and 2019, when DCFS received two reports that mother's home was unsanitary and unsafe.

2

In July 2024,[1] DCFS received a report that mother used drugs and left drugs and drug paraphernalia in the children's reach. A social worker attempted three times to visit the home, but the home was inaccessible because it was surrounded by a gate and debris. The social worker tried to reach mother by telephone and sent her a certified letter, to which mother did not respond. On the social worker's fourth visit to the home on August 6, the social worker was able to speak to mother and the children outside of the home, but mother would not allow a home assessment that day and refused to drug test. Mother asked the social worker to come back to assess the home on August 23. On August 23, mother called the social worker and asked to reschedule the home assessment for August 27, and on August 27, mother called the social worker to say that she was not home and needed to reschedule the home assessment again. The social worker told mother she was trying to work with her, but that if mother did not cooperate voluntarily, DCFS would obtain a court order to search the house.

The social worker visited the home again on September 5 and 17 but did not see mother or gain entrance to the home, and she attempted unsuccessfully to reach mother by phone and text on September 13. Mother finally responded to the social worker's text on September 18, stating that she would not allow a home assessment because the social worker was "being not flexible and [was] inconsiderate of my life."

The social worker obtained an investigative search warrant, and law enforcement and two social workers executed the warrant on September 26. The social workers reported that

---

[1]     All subsequent dates are in 2024 unless otherwise indicated.

3

three adults were in the home when the warrant was executed, including a woman who said she rented a room from mother. One of the women had a warrant for her arrest, but said she provided childcare for mother. There were three dogs in the home, and what appeared to be animal feces were smeared on the home's front door and on the stairs. In the children's bedroom, there were fresh animal feces on the children's clothes, as well as feces and urine on the floor next to the children's clothes and shoes. In another bedroom, there was a syringe on a nightstand and circular saws with the blades exposed on the floor. The bathroom closest to the children's bedroom was gutted and filled with hazardous tools, and another bathroom was also gutted, with wood and drywall exposed. The home's den contained drug paraphernalia, including cut straws, single burner stoves, and spoons, and it smelled of fresh smoke. There was marijuana and alcohol near the garage in areas accessible to the children.

DCFS filed a juvenile dependency petition in September alleging that the family home was unsanitary and hazardous (count b-1), and that mother left drugs and drug paraphernalia within the children's reach (count b-2). On October 1, the juvenile court ordered the children detained from mother, issued an arrest warrant for mother, and issued protective custody warrants for the children. The children were detained at school on October 3 and placed in foster care.

Cheyenne's teacher said Cheyenne had been coming to school disheveled and dirty. The children's bus driver reported that the children were dropped off and picked up by different people each day.

On October 15, mother's counsel requested that mother's home be reassessed and the children be released to mother.

4

Alternatively, counsel requested that mother be permitted unmonitored visits with the children in a public place. Counsel reported that the animal feces referenced in the detention report were from a roommate's dogs, which were no longer in the home, and that mother had cleaned up the home and yard. Counsel for the children and for DCFS asked that the children remain detained and mother's visits with the children be monitored based on the home's inhabitability and the presence of drug paraphernalia.

The court ordered the children detained from both parents and placed in foster care. Mother was permitted monitored visits.

DCFS conducted a subsequent assessment of the home on October 17. The social worker observed that the home was much less hazardous than it had been during the initial walkthrough: The children's room was clean and free of obvious hazards; mother had begun removing unnecessary objects from the yard; the home's entrance was unobstructed; and mother reported that her roommates had moved out. However, there were still many inoperable cars and appliances in the front yard, only one bathroom was operable, and two dogs were lounging in front of the home.

On November 13, DCFS filed a first amended petition adding allegations that father had failed to protect the children from mother (counts b-1 and b-2), had lengthy criminal and drug histories (count b-3), and had engaged in domestic violence with mother (count b-4).

On November 15, the juvenile court ordered the children placed with the paternal grandmother.

## II.  Jurisdiction and disposition hearings.

At the jurisdiction hearing on January 8, 2025, mother's counsel asked the court to strike the b-1 and b-2 counts because mother had cleaned and decluttered the home, and to strike the b-4 count because mother and father had ended their relationship and mother had obtained a protective order.  DCFS asked the court to sustain the petition as pled; while DCFS conceded that mother had made progress in alleviating some of the concerns alleged in the petition, it noted that it had previously received reports that mother was not maintaining a safe home for the children, and "these are really symptoms of a larger issue that still needs to be addressed."  The children's counsel asked the court to sustain the b-1, b-2, and b-3 counts.

After hearing argument, the court sustained counts b-1 (unsanitary home)[2] and b-3 (father's criminal and substance abuse history), and it dismissed counts b-2 (drug paraphernalia accessible to children) and b-4 (domestic violence between parents).  The court then continued the disposition hearing to the following month.

On January 31, 2025, DCFS reported that mother had been arrested for an unspecified felony charge on January 4, 2025, and had tested positive for methamphetamines on January 14, 2025.  Mother had visited the children inconsistently, frequently failing to show up to visits without any prior notice.  DCFS thus recommended that mother be required to complete an outpatient drug program, drug test on demand, and complete a parenting

---

[2]  The court struck the allegations that father had failed to protect the children from the unsanitary home.

class, a support group for domestic violence victims, and individual counseling.

At the February 2025 disposition hearing, mother requested that the children be released to her or that she be allowed unmonitored visits. She further requested that she not be required to enroll in drug and parenting programs, but instead be allowed to address drug and parenting issues through individual counseling. Mother contended that she had tested negative for drugs many times and had tested positive for methamphetamines only because she had taken prescription pseudoephedrine to treat a cold. DCFS disagreed, urging that the issues that brought the case to its attention had not been resolved. DCFS argued: "The circumstances in which the minors were living were a symptom and not the actual problem necessarily. . . . The condition of the home as well as what was contained in the home, certainly lent itself to the idea that there is a drug issue . . . within this family. [¶] [Further,] mother's explanation for her dirty test results [is not supported by] any evidence . . . . It wasn't provided to the Department at the time of her results. And given the sustained petition, it's not surprising that we have these continued results. And what's probably even more concerning is that we have them during the supervision of this case and the pendency of the disposition."

The children's counsel joined DCFS's recommendations. Counsel noted that the children were very young, and he urged that while DCFS should have discretion to liberalize mother's visits, he believed visits should remain monitored at the present.

The juvenile court found by clear and convincing evidence that there was a substantial danger to the children's safety in the parents' care, and there were no reasonable means to protect

them without removal.  The court therefore ordered the children removed from both parents and ordered mother to complete a full drug program, a domestic violence support group for victims, individual counseling, and a parenting class.  Mother was granted nine hours of monitored visits with the children weekly.

Mother timely appealed from the jurisdiction and disposition orders.

## DISCUSSION

On appeal, mother contends that substantial evidence did not support the finding that she maintained an unsanitary home, and the juvenile court abused its discretion by removing the children from her custody and restricting her to monitored visits. Mother's contentions lack merit, as we discuss.

I.    **The jurisdictional findings regarding mother's unsanitary home were supported by substantial evidence.**

Welfare and Institutions Code[3] section 300, subdivision (b)(1)(A) provides that a child is within the juvenile court's jurisdiction if, among other things, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child."

In deciding whether there is a substantial risk of serious physical harm within the meaning of section 300, subdivision (b)(1), courts evaluate the risk at the time of the

_____

[3]    All subsequent statutory references are to the Welfare and Institutions Code.

8

jurisdiction hearing. " 'The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.' " (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.)  Jurisdiction may not be based on past endangering conduct in the absence of evidence that such conduct is likely to reoccur.  (*In re C.V.* (2017) 15 Cal.App.5th 566, 572.)  However, "the court need not wait until a child is seriously abused or injured to assume jurisdiction" and may "consider past events in deciding whether a child presently needs the court's protection." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602.)  A parent's " ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*Ibid.*; see also *In re Ma.V.* (2021) 64 Cal.App.5th 11, 23 [there must be some reason to believe acts creating a risk of harm to the child will continue in the future]; *In re J.N.* (2021) 62 Cal.App.5th 767, 775 [there must be "a nexus between the parent's past conduct and the current risk of harm"].)

We review the juvenile court's jurisdictional findings for substantial evidence. " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

We note as an initial matter that although mother has not challenged all of the jurisdictional findings, her challenge to the juvenile court's true finding as to count b-2 of the petition is

justiciable. An appeal of one of several jurisdictional findings is justiciable if it "affects parental custody rights [citation], curtails a parent's contact with his or her child [citation], or 'has resulted in [dispositional] orders which continue to adversely affect' a parent." (*In re D.P.* (2023) 14 Cal.5th 266, 278.) Here, mother's challenge to the juvenile court's finding that the condition of the home placed the children at risk of harm is justiciable because it was the basis for the juvenile court's disposition order removing the children from mother's custody and denying mother's request for unmonitored visitation.

On the merits, mother contends that the juvenile court erred by sustaining count b-1 of the petition because although the family home admittedly had been unsanitary and unsafe prior to DCFS's intervention, mother had rectified the problems by the time of the January 2025 disposition hearing. Not so. While the home unquestionably was far less hazardous by the time of the jurisdiction hearing, the home's condition was not the only issue relevant to the jurisdictional finding. Instead, the court was permitted to consider whether the unsafe home was a symptom of underlying issues that continued to put the children at risk of harm even after the specific dangers in the home had been addressed.

Below, counsel for the children and for DCFS argued, and the court apparently agreed, that the deplorable condition of the home was a "symptom[ ] of a larger issue that still needs to be addressed"—namely, that mother was using illicit drugs. This conclusion was supported by substantial evidence. Mother had a long criminal history, including four recent convictions for possession of controlled substances. The administrative search warrant found evidence of recent drug use in mother's home,

10

including drug paraphernalia in the den, a syringe in one of the bedrooms, and marijuana near the garage, and the smell of fresh smoke in the den. Further, mother tested positive for methamphetamines on January 14, 2025, just weeks before the disposition hearing. On this record, the juvenile court could reasonably conclude that the unsanitary home conditions were symptomatic of a drug problem that mother had neither acknowledged nor addressed, and which continued to impair mother's judgment and place the children at substantial risk of serious physical harm. The juvenile court therefore did not err by sustaining count b-1 of the petition.

## II. Substantial evidence supported the juvenile court's removal finding.

Section 361, subdivision (c)(1) provides that a child shall not be taken from the parents' physical custody unless the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

We review a dispositional order removing a child from a parent for substantial evidence, " ' "keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." ' (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.)" (*In re M.V.* (2022) 78 Cal.App.5th 944, 960.) In applying this standard of review, " 'the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could

11

have found it highly probable that the fact was true.' [Citation.] We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Ibid.*)

Mother contends the juvenile court abused its discretion by removing the children from her custody because there was no clear and convincing evidence that the children would be in substantial danger if they were returned home. Instead, mother urges, the juvenile court could have adequately protected the children by offering mother preservation services, family therapy, or wraparound services. We disagree. As we have discussed, the juvenile court was well within its discretion in concluding that mother had a drug problem that had not been ameliorated and continued to place the children at risk of harm. Moreover, there was good reason to believe that in-home services would not be sufficient to keep the children safe. The reports before the juvenile court documented that mother had repeatedly resisted letting DCFS case workers into her home: On August 6, mother refused to permit a home inspection and asked the social worker to return on August 23; on August 23, mother rescheduled the home inspection for August 27; on August 27, mother said she was not home and would need to reschedule the inspection; and on September 17, mother said she had changed her mind and would not allow a home inspection. In other words, mother put off the social worker for approximately six weeks before ultimately refusing to allow DCFS workers inside her home. The juvenile court thus could reasonably have concluded that mother would not allow DCFS regular access to the children and the

12

family home in the future.  Further, although the children had not yet suffered harm in mother's custody, the record demonstrated that mother repeatedly had made reckless and unsafe choices, including allowing drug users to live in the home, leaving drugs, needles, and saws within the children's reach, permitting a woman with an outstanding arrest warrant to babysit the children, and engaging in criminal conduct.  On this record, substantial evidence supported the juvenile court's finding that the children could not safely remain in mother's custody.

## III.  The juvenile court did not abuse its discretion by restricting mother to monitored visits.

The juvenile court has broad discretion in ordering visitation between dependent children and their parents.  (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557; *Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1162–1163.)  In making visitation orders, the court is guided by the principle that "[v]isitation shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A); *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138.)  Equally important, however, is the statutory dictate that "[n]o visitation order shall jeopardize the safety of the child."  (§ 362.1, subd. (a)(1)(B).)  Thus, visitation orders necessarily involve "a balancing of the interests of the parent in visitation with the best interests of the child.  In balancing these interests, the court in the exercise of its judicial discretion should determine whether there should be any right to visitation and, if so, the frequency and length of visitation.  The court may, of course, impose any other conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before it." (*In re*

13

*Jennifer G.* (1990) 221 Cal.App.3d 752, 757.)  We review an order setting visitation terms for abuse of discretion, and we will not disturb the order unless the trial court made an arbitrary, capricious, or patently absurd determination.  (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)

As discussed above, mother had made a series of dangerous choices that endangered the children, including using illegal drugs, leaving the children in the care of a woman with an outstanding arrest warrant, leaving saws, drugs, and needles accessible to the children, allowing drug users to live in the home, and engaging in criminal conduct.  On this record, the juvenile court did not abuse its discretion by allowing mother to visit the children only in a monitored setting.

## DISPOSITION

The jurisdiction and disposition orders are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EDMON, P.J.

We concur:

EGERTON, J.

ADAMS, J.

15