Filed 10/24/25  In re N.V. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re N.V. et al., Persons Coming Under the Juvenile Court Law. | B341630 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>R.V.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. 21CCJP01063E-H) |

APPEAL from orders of the Superior Court of Los Angeles County, Pete R. Navarro, Temporary Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

R.V. (father) appeals from an order terminating dependency jurisdiction under Welfare and Institutions Code section 362.4[1] and granting sole physical and legal custody of minors to R.D. (mother).  Father contends that the court abused its discretion by granting sole legal custody to mother, where father was fully compliant with his case plan, but where the children were declining visits due to their ongoing fear of father.  The Department of Children and Family Services (Department) contends the juvenile court's custody order was within the bounds of its discretion.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Family Background and Initial Investigation

Mother and father were married for more than 13 years, and they have four children together.  At the start of the current dependency case, the children's ages ranged from 3 to 14 years old:  3-year-old A.V., 8-year-old J.V., 10-year-old B.V., and 14-year-old N.V.

The Department received a referral in early September 2023 after mother reported father's physical abuse to law enforcement.  A social worker interviewed mother and all four children.  Mother reported that, in April 2023, she discovered father was having a relationship with another woman.  Mother and father agreed father would move out of the home but come

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

over to visit the children. According to mother, father was physically and emotionally abusing her during his visits with the children, and the children would see father pushing, hitting, and choking her against a wall when he was in a rage. Mother shared with the social worker text messages father sent mother between May and August 2023 making specific threats of violence against her and the children, including threats to kill himself, mother, and the children. Mother had filed for divorce and had no intent to reconcile with father. In August 2023, mother obtained an emergency protective order from law enforcement and also filed in court for a domestic violence restraining order (DVRO) against father; her application summarized father's abusive conduct. In early September, mother reported the abuse to police and obtained an extension of the DVRO.

Each of the four children disclosed to the social worker that they were aware of father's abusive conduct towards mother, and they all felt safe with mother. The oldest child, N.V., described father as always angry and yelling, and he had seen father pushing mother onto the couch or against the wall and choking mother with his hands around her neck. N.V. was in counseling to address his exposure to father's domestic violence. He did not want to see father. B.V. was scared of father and had seen father hit and yell at mother. J.V. had heard father yelling at mother and heard father hitting mother, although he did not see the fighting. J.V. did not feel safe around father. The youngest child, A.V., had seen father hit mother and wanted to take a break from seeing father.

When father appeared for an interview with the social worker at the Department office on September 19, 2023, he had

not yet been interviewed by law enforcement in connection with mother's police report earlier that month. Father told the social worker that he and mother had separated in April 2023. He acknowledged pushing mother but denied choking her. He claimed his threatening text messages were not serious. He said he had enrolled in individual counseling, had one session, and signed up for anger management.

When the social worker tried to obtain a copy of the police report of the September 6, 2023 domestic violence incident, the worker was informed that father was arrested on September 21, 2023, was out on bail, and the next criminal hearing was scheduled for October 24, 2023.

## B. Dependency Petition and Adjudication

On September 28, 2023, the Department filed a petition alleging minors were dependents under section 300, subdivisions (a) and (b), based on father's violent conduct and mother's failure to protect. The petition contained detailed descriptions of acts of violence father perpetrated against mother. Both parents appeared at the initial hearing on October 12, 2023. Minor's counsel reported that the children did not want to visit father, because they were afraid of him based on his past behavior. When the court ordered monitored visits at the Department offices, counsel for both mother and father requested visits in a therapeutic setting, which the court ordered. The juvenile court ordered minors to be detained from father and entered a restraining order prohibiting father from having any contact with mother or minors outside of the therapeutic visits.

4

The Department filed a jurisdiction and disposition report in mid-November 2023. When father was interviewed about the violent incidents described in the petition, he minimized his actions or said he did not remember them. On October 24, 2023, he pled not guilty to three counts in the criminal case against him and received referral paperwork for a domestic violence program. He was participating in individual counseling and anger management with a focus on domestic violence.

Addressing the issue of the children's safety in the home, the Department stated that both parents were actively participating in services and had been cooperative with the Department, but that "father has not yet fully addressed the underlying issues affecting his aggressive behaviors, and the children report that they are still fearful of the father." Therefore, the Department advised it would be appropriate for the children to remain with mother. The Department acknowledged that father was forthcoming about some of the domestic violence and felt remorseful about how his aggressive actions negatively affected his children, but the Department was concerned with the specificity and nature of homicidal and suicidal threats father had made in texts he sent to mother. The children had not agreed to visit father, even in a therapeutic setting, due to their ongoing fear. The Department identified two separate restraining orders protecting mother and minors from father. The juvenile court's order provided for father's monitored visits in a therapeutic setting with minors. The order was to remain in effect until the adjudication hearing in November 2023. A separate order, granted to mother in August 2023, prohibited any contact between father and the rest of the family, and there was a hearing scheduled for December 2023.

At the adjudication and disposition hearing in late November 2023, the juvenile court sustained amended allegations, striking the allegations of mother's failure to protect, meaning she was a non-offending parent. The children were removed from father's custody and remained placed with mother. Father was ordered to attend a domestic violence program, an anger management program, individual counseling to address case issues, and mental health counseling, including a psychiatric evaluation for which he was to take all prescribed medication. The court entered a restraining order, including stay away and no contact orders except as otherwise provided for by the court, protecting mother and the children from father for a three-year period, expiring in 2026. Father was permitted to have monitored visits, either in a therapeutic setting or at a Department office.

## C.     Participation in Services and Visits

During the first six months following adjudication, the three older children declined to attend visits with father. Minors also declined to receive handwritten letters from father. The youngest daughter, A.V., had one visit with father at the end of February 2024, but the visit did not go well, and both A.V.'s therapist and her preschool teacher noted a dramatic change in her demeanor in the days following the visit. A.V. declined any further visits with father. Both mother and father maintained excellent communication with the Department and were participating in court-ordered programs.

At a review hearing on May 28, 2024, the court heard argument from all parties about father's desire to visit the

children, their ongoing refusal, and the impact of A.V.'s single visit.  The court asked the parties to consider who might monitor the visits in order to ensure the children felt comfortable, and mother objected to paternal grandmother monitoring the visits.  Ultimately, the court kept its order for monitored visits in place.[2]

On May 30, 2024, the social worker asked about visitation, and the three younger children all declined.  The youngest was very talkative with the social worker, but her demeanor shifted dramatically when discussing father, shutting down or running away to end the conversation.  J.V. continued to decline visits, and when the social worker asked for J.V. to share a little bit about his feelings, J.V. said " 'I don't feel comfortable sharing yet.' "  B.V. shared that he did not want to visit, and that he felt that father was trying to forget what happened and "sweep it under the rug."  When the social worker asked the oldest, N.V., about visiting father, N.V. nodded his head.  When the social worker asked N.V. to clarify, N.V. responded " 'yes.' "  The social worker told N.V. she would speak with mother to coordinate a date and time for him to see his father.  A few days later, mother informed the social worker that N.V. wanted to speak with the social worker about changing his mind about visitation.  N.V. shared that " 'I just feel like I said yes too fast.  I know one day I would like to see him, but I still need more time to process everything and heal properly.' "  The social worker acknowledged

---

[2] There was some confusion expressed at the hearing about whether the court's May 28, 2024 order contradicted a separate criminal protective order, but counsel for father clarified that the criminal court was deferring to the juvenile court on the question of visitation.

7

the child's statement and reassured him to not be scared and to know the social worker would be present during the visit if he felt unsafe.  N.V. still said he did not feel comfortable visiting now, and would think about it for the future.

Between June and September 2024, the children continued declining visits with father.  The social worker reported that maternal aunt had been screened to be an approved monitor to encourage the children to visit, but the children continued to decline.  The social worker also explored the idea of monitored video or telephonic calls with father, but the option was not available "due to the active [criminal protective] order."  In September 2024, the Department reported that the social worker spoke with the children on a weekly basis to encourage them to attend visits with father.  The children had a positive response to their therapy sessions and had been able to develop age appropriate communication skills; and they were receiving tutoring services and their grades improved.  However, they continued to decline visits with father.  Father and mother had complied with their case plans, and father had provided the social worker with one letter in the hopes that one of the children would like to read it.  N.V.'s therapist reported he had made progress, but maintaining his mental health would be an ongoing process, possibly for the rest of his life due to the events he had witnessed.  B.V. and J.V. had graduated from therapeutic services in May 2024, but in August, mother informed the social worker she would be re-enrolling both children, because they had both stated they were scared father might return to the home.

The Department recommended terminating the dependency case and granting sole physical and legal custody of

minors to mother, with father having monitored visits once the children were comfortable, with a trusted monitor.

At the review hearing on September 9, 2024, father's counsel objected that notice was inadequate and asked the court to continue jurisdiction over the matter to allow father to have monitored visits with A.V., arguing that six additional months of reunification services would be in the children's best interests. County counsel, as well as counsel for mother and minors, argued that despite the Department's best efforts, it was not in minors' best interests to continue the case. However, the Department also acknowledged that notice was inadequate and proposed continuing the hearing for a ruling three weeks later.

At the continued hearing on October 10, 2024, the juvenile court allowed counsel to restate their arguments. The court acknowledged father's compliance with the case plan and his cooperation with the Department, but noted that minors had been scarred by witnessing father's attacks on mother. It ordered jurisdiction over minors be terminated upon issuance of a juvenile custody order granting mother sole physical and legal custody, with father having visits for two hours per week, monitored by a mutually agreed upon monitor or a paid professional monitor. Nothing in the court's order gave the children discretion over whether visits would take place. After the court announced its ruling, father's counsel asked the court to state the basis for granting mother sole legal custody and monitored visits. The court responded it was in the children's best interest to have the comfort of knowing their mother had sole physical and legal custody, and the court hoped the order for sole legal and sole physical custody would ease the childrens'

9

anxieties about visits with father.  The custody order was filed on October 14, 2024 and father filed a timely appeal.

## DISCUSSION

### A.  Legal Principles

"Section 362.4 governs the termination of juvenile court jurisdiction and related orders."  (*In re J.M.* (2023) 89 Cal.App.5th 95, 112 (*J.M.*).)  "The statute authorizes a juvenile court to make 'exit orders' regarding custody and visitation upon terminating dependency jurisdiction over a child."  (*Ibid.*; *In re Chantal S.* (1996) 13 Cal.4th 196, 202–203.)  "These exit orders remain in effect until modified or terminated by a subsequent order of the superior court."  (*J.M.*, *supra*, 89 Cal.App.5th at p. 112, citing § 362.4, subd. (b); see also Cal. Rules of Court, rule 5.700.)  Exit orders are filed with the family court upon the termination of dependency jurisdiction.  (§ 362.4; *Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1165.)  If there is later a significant change in circumstances and it would serve minors' best interests to change the custody and visitation orders, a parent can seek a modification in the family court.  (§ 302 subd. (d); *Heidi S., supra*, at p. 1165.)

" '[I]n making exit orders, the juvenile court must look at the best interests of the child.' "  (*J.M.*, *supra*, 89 Cal.App.5th at p. 112.)  "The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child."  (*In re Chantal S., supra*, 13 Cal.4th at p. 201.)  The juvenile court, "which has been intimately involved in the protection of the child,

is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions." (*In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712 (*Jennifer R.*).)

We review the court's exit orders for an abuse of discretion. (*J.M., supra*, 89 Cal.App.5th at pp. 112–113.) We do not disturb the court's order unless appellant demonstrates that it exceeds the bounds of reason or is arbitrary, capricious, or patently absurd. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 [reviewing court cannot substitute its decision for that of the trial court when the facts can support more than one reasonable inference]; *In re N.M.* (2023) 88 Cal.App.5th 1090, 1094.)

## B.    Analysis

Father contends the juvenile court erred by granting mother sole legal custody of minors. Father acknowledges that the juvenile court has broad discretion in making its exit orders, and that the presumption of joint custody applicable in family law cases does not apply in a case where a juvenile court has exercised dependency jurisdiction. Instead, father focuses on his actions during the course of the dependency proceedings—his cooperation with the Department, his early, consistent, and exemplary participation in court-ordered services, and his acknowledgement of the pain and harm his prior actions caused to his children. Father argues that the juvenile court erred because the circumstances of this case are distinguishable from circumstances in *Jennifer R., supra*, 14 Cal.App.4th at pp. 713–714, where mother had an extensive history of serious mental illness, was irregular in her visits with her daughter and failed to drug test or follow through on drug rehabilitation referrals and

11

the reviewing court affirmed an order awarding sole physical and legal custody to father.

That another court affirmed an award of sole legal custody under different circumstances is of minimal relevance to our analysis of whether the court abused its discretion here. The juvenile court is tasked with making orders that serve the best interests of each unique child before it, not comparing a parent's efforts or struggles to those in other cases to determine whether joint custody is "justified" in the abstract.

In the present case, the Department recommended giving sole physical and legal custody to mother, and both minor's counsel and mother's counsel argued that an order granting mother sole custody was warranted based on nature of father's threats and the children's continuing fears, despite having participated in therapy.

Father's statement of the case includes some discussion of the parties' competing efforts to resolve inconsistencies between the juvenile court's visitation order and the criminal protective order, but we do not consider those facts relevant to determining whether the court abused its discretion in agreeing with the Department, minor's counsel, and mother that giving mother sole legal custody was in the children's best interests. To the extent father believes inconsistent protective orders might have impeded monitored visits, the inconsistency was resolved by July 24, 2024. To the extent that father's counsel made an argument to the trial court that mother might be coaching the children, minors' counsel advised the court, "All four of the children have maintained in the last six months that they do not want to have any visits with the father. I have spoken to them at length. I have also explained to them that father has made a lot

of progress in his case plan.  But they are adamant.  They are very clear in their wishes that they do not want any visits with the father at this time.  And so that would be my position.  [¶]  I am also asking for sole legal, sole physical [as] to mother, and no visits for the father until the children express they are ready.  All children have been in counseling.  I believe the three youngest have finished counseling.  [N.V.] is still in counseling.  These are issues they are working through.  And their position remains firm."

The court's own articulation of its reasoning for granting mother sole legal custody demonstrates that there was no abuse of discretion.  As the court explained, it was in the children's best interests in knowing that mother had sole legal and physical custody, and the court hoped that the order would give the children the sense of security necessary for them to be able to have visits with father.

## DISPOSITION

The juvenile court's orders are affirmed.
NOT TO BE PUBLISHED.


MOOR, J.


WE CONCUR:


BAKER, Acting P. J.          KIM (D.), J.

13